## THE UNITED STATES, APPELLANTS, *v.* SAMUEL DAVENPORT'S HEIRS.

Two grants of land in the country known as the neutral territory lying between the Sabine River and the Arroyo Hondo. confirmed, namely, one for La Nana granted in 1798, and the other for Los Ormegas granted in 1795.

These grants were made by the commandant of the Spanish post of Nacogdoches, who at that time had power to make inchoate grants.

In both cases the grants had defined metes and bounds, and the grantees were placed in possession by a public officer, and exercised many acts of ownership.

The evidence of the grants was copies made by the commandant of the post, and also copies made by the land-office in Texas. These copies, under the circumstances, are sufficient.

At the date of these grants, it was necessary to obtain the ratification of the civil and military Governor before the title became perfected. This not having been done in the present case, the title was imperfect, although the petition alleges that it was perfect, and the District Court had jurisdiction under the Acts of 1824 and 1844.

But the District Court ought not to have decreed that floats should issue where the United States had sold portions of the land, because these vendees were not made parties to the proceedings.

THIS was an appeal from the District Court of the United States for the Eastern District of Louisiana, under the Acts of 1824 and 1844 so often referred to in cases previously reported.

The facts of the case are recited in the opinion of the Court.

It was argued by *Mr. Cushing* (Attorney-General) on the part of the United States, and by *Mr. Baldwin* and *Mr. Johnson*, with whom was *Mr. Coxe*, on behalf of the appellees.

The points made on the part of the United States were,

I. That the court below had no jurisdiction, and that the decrees are therefore nullities.

These grants were complete titles, requiring nothing more to be done to perfect them; and the cases are full of proof, offered

by the claimants, to show that the grants were perfect grants. But the act of 1824 applies only to cases of incomplete titles, to cases protected by the treaty of 1803, "and which might have been perfected into a complete title, under, and in conformity to, the laws, usages, and customs of the governments under which the same originated, had not the sovereignty of the country been transferred to the United States." 1 Land Laws, 385. The point, it is conceived, is decided in the case of the United States *v.* Reynes, 9 Howard, 144, bottom of page, and 145.

II. That there is no sufficient evidence of the execution of the grants by Fernandez and Gaudiana.

III. That, even if their execution is proved, then they are void; because Fernandez and Gaudiana had no authority to make such large grants. Laws for the sale and distribution of lands. 2 White's Rec. p. 48 to 55; Royal Ordinance of 13th October, 1749, Ibid. 67; Royal Ordinance of 1754, Ibid. 62; O'Reilly's and Gayoso's Regulations, Ibid. 229, 231.

IV. That even if their execution is proved, then the grants are void, because no lands were severed from the public domain by surveys, giving a certain location previous to the treaty of 1800 or even 1803, and the descriptions in the grants are so vague, indefinite, and uncertain, that no location of the lands embraced in them can be given. United States *v.* Miranda, 16 Peters, 156 to 160; 15 Peters, 184, 215, 275, 319; 10 Peters, 331; 3 Howard, 787; 5 Howard, 26; United States *v.* Boisdore's heirs, 11 Howard, 63; Lecompte *v.* United States, Ibid. 115.

V. That the claimants are not within the provisions of the act of 1824, and there are not the proper averments in their petitions to show that they are entitled to its benefits.

The counsel for the appellees made the following points:—

1. The territory within which both of these grants were situate was, at their respective dates, within the boundaries of Texas, (the Arroyo Hondo being the eastern boundary,) and subject to the dominion and control of the commandancy at Nacogdoches, so far as related to the granting of lands.

2. The civil and military commandants at that post were, *ex officio*, lieutenant-governors, and had authority to grant lands within their province or department.

3. These grants were made by them in manner stated in the petitions, and were in conformity with the laws, usages, and customs of Spain, which then existed in the province of Texas and at the post of Nacogdoches.

4. These grants gave to the grantees therein named, and to their legal representatives, a good title to the premises in them respectively described.

5. The plaintiffs, in these suits, have shown themselves, by a regular deduction of title, the owners of the William Burr and Samuel Davenport interests in both tracts; and are, therefore, entitled to recover.

*Mr. Johnson*, in his argument, said that the United States had not denied the existence of the original grants. As to the allegation that the lands were not severed from the royal domain, if the grant was capable of being located, it need not be actually severed. Glenn *v.* United States, 13 Howard, 250. This grant can be located. A centre being given, a line must be run from it two leagues to the north and two to the south; then from each end, two east and two west; then close the survey. The record shows that the centre tree existed. The other grant can be surveyed also.

But it has been said that if these titles are good for any thing, they are complete titles, and therefore not within the jurisdiction of the court under the acts of 1824 and 1844.

We are aware that in the case of the United States *v.* Reynes, 9 Howard, 127, this court has decided that perfect grants, arising under the treaty of 1803, do not fall within, and are not embraced by, the provisions of this law; and to that decision we bow with respectful deference; but we ask the court whether the two grants under consideration are of that description? We submit to your honors whether the fact that these grants were made by the civil or military commandants; whether from the fact that they lay within the neutral territory, a territory which, from its earliest history, was in' dispute between the commandants at Natchitoches, in Louisiana, and Nacogdoches, in Texas, and which, by the treaty of 1819, falls within the limits of Louisana; seeing that the grants originated with the commandant in Texas, — are not considerations which will take these cases out of the operation of that decision. Notwithstanding the proof in these cases to the contrary, we submit, whether, under the laws of Spain and of the Indies, *stricti juris*, these grants, to make them perfect and complete, did not require the sanction of the Home Department and authority. Such was the construction put upon them by Governor Salcedo himself, the governor of the internal provinces, when " on his way to San Antonio he collected all the titles he could, in order to have them confirmed." See Colonel Bloodworth's testimony, Y. and M., O. R. p. 201; N. R. 187. And did not the submission of Davenport & Co. of one of the grants to Governor Salcedo, show that they deemed the sanction of the acts of the military commandant, who made the grant, by a higher authority necessary; and did not the action of that governor show his own

acquiescence in these views, and also show that the grant was farther embarrassed, by the fact that it lay within the neutral territory? Y. and M., O. R. p. 140; N. R. 130. This, too, is in accordance with the testimony of Benjamin Fields, who swears that he always supposed such sanction necessary; p. 92 and 93; N. R. 89, 90; and are not these views strengthened by reference to the note of the commissioners, p. 43, 44, and 51? In which last note the commissioners say: —

"It appears to be a historical fact, that the strip of country called the neutral territory was early disputed by the ancient governments of Texas and Louisiana, both alternately assuming and repelling jurisdiction over it; and even after both provinces were united under the dominion of Spain the dispute did not subside, but was kept alive and perpetuated by the local commandants, &c." These commissioners, in their several reports, after classing these in the first class of claims, recommend them for confirmation; a language which would not have been used in reference to perfect titles, and which, coming from them, is to be regarded as the language of the government itself. 9 Pet. R. 468.

These were the grounds on which the District Attorney, in the court below, insisted that the grants were inchoate and not perfect and absolute; and we with great confidence submit to the court, therefore, whether these combined considerations do not clearly distinguish these cases from that of the United States v. Reynes, before referred to; and if so, whether they are not embraced by the act under which the suits are brought; and in view of the whole case in all its aspects, we, with like confidence, submit whether we are not entitled to recover.

1 Howard, 24; 7 Pet. R. 51; 10 Pet. R. 303; Civil Code, title Prescription, 3421, 3437, 3438, 3465, and 3466; 2 White's Recop. 191; Duff Green's American State Papers, vol. 3, p. 72 to 83; Ib. vol. 4, p. 34 – 36, 60, 61, 75; Executive Document, 33, 2d session, 27th Congress, p. 81. Doe v. Eslava et al. 9 Pet. R. 449; Doe v. The City of Mobile, Ib. 468.

"The authority given to these officers (the register and receiver) was to be exercised only in cases of imperfect grants, confirmed by the act of Congress, and not cases of perfect titles; in these they had no authority to act."

Mr. Justice CAMPBELL delivered the opinion of the court.

This cause comes before this court by an appeal from a decree of the District Court of the United States for the Eastern District of Louisiana.

The appellees filed their petition in that court to establish their claim to a share in two grants of land, situate on the western border of Louisiana, in the country known as the

neutral territory, lying between the Sabine river and the Arroyo Hondo.

One of these grants was issued by the commandant of the Spanish post at Nacogdoches to Edward Murphy, the 1st day of July, 1798, for a tract of land called La Nana, containing 92,160 acres. The grantee, in the month of November following, conveyed it to the trading firm of William Barr & Co., of which Murphy and Samuel Davenport, the ancestor of the appellees, were respectively members.

The evidence of the grant consists in copies of the petition of Edward Murphy to the commandant, dated in February, 1798, for a donation of the tract La Nana, situate to the east of the Sabine river, on the road leading from the town of Natchitoches. The tract asked for forms a square of four leagues upon that road, the centre of which is the prairie adjoining the bayou La Nana. The motive of the application was, that the petitioner might have summer pasturage for his cattle and other animals. The petition was granted by the commandant, and the procurator was ordered to place the grantee in possession. The procurator fulfilled this order the first of August, 1798, by going upon the land with the grantee and in the presence of witnesses, "took him by the right hand, walked with him a number of paces from north to south, and the same from east to west, and he, letting go his hand, (the grantee,) walked about at pleasure on the said territory of La Nana, pulling up weeds and made holes in the ground, planted posts, cut down bushes, took up clods of earth and threw them on the ground, and did many other things in token of the possession in which he had been placed in the name of His Majesty, of said land with the boundaries and extension as prayed for."

The act of possession was returned to the commandant, who directed " that it should be placed in the protocol of the post to serve as evidence of the same, and that a certified copy should be given to the person interested." The conveyance of Murphy to his firm bears date in the month of November after; was executed in the presence of the same commandant, and at that time the certified copies offered in evidence, purport to have been made.

The other grant is for a tract of land called Los Ormegas, containing 207,360 acres. It is founded on a petition of Jacinta Mora to the commandant of the same post, in November, 1795, who asked for the concession, that he might establish a stock farm for the raising of mules, horses, horned cattle, &c., and to cultivate the soil. The tract described in the petition contains six leagues square on the river Sabine, the centre of the Western line being opposite to the Indian crossing place of that river.

1*

The prayer of the petition was allowed the same day, and orders given to the procurator to place the petitioner in possession, "with all the usual formalities of style, and that he should report his proceedings for the more effectual confirmation of the property."

This order was executed in December, 1795, with the same ceremonial that was employed about the order upon the La Nana grant, and the act recording the transaction was placed in the protocol of the post.

The paper in evidence is a certified copy made by the commandant of the post in 1806, shortly before the conveyance of the grantee to the firm of William Barr & Co., and in the certificate the copy is declared to have been compared and corrected, and that it is true and genuine.

Besides these papers, the plaintiffs procured certified copies from the officers of the land-office in Texas, from copies of the protocol made in 1810, which were submitted by the firm of Barr & Co. to the governor (Salcedo) of one of the internal provinces of New Spain, of which this post was at the time a dependency, apparently for the purpose of obtaining his sanction, either to the authenticity of the document, or to the grant it evinced. This copy of the La Nana papers does not correspond with that of 1798, but that of the Ormegas grant is substantially the same as that made in 1806.

The plaintiffs, farther to support their claim, offered evidence satisfactorily explaining why these papers came to be deposited in the archives of Texas and for the fact of their discovery there.

These claims were presented in 1812, to the commissioners appointed to ascertain and adjust claims to lands in the Western District of Louisiana, and have been before the several boards which have been since constituted to effect the same object. The genuineness of the signatures which appear on these copies of the grant; that they have come from a proper depository; that the parties who now hold them have claimed them since the date of their titles; that the lands are fitted for the objects for which they were sought, and have been used for that purpose; that surveys and possession defined their limits, contemporaneously, or nearly so, with the grants, are facts sufficiently established by the evidence submitted to the District Court. No imputation upon the authenticity of the grants occurs in any of the reports or acts of the government, but in the various reports of the Boards of Inquiry they have been treated as genuine, resting upon just considerations, and entitled to confirmation from the equity of the government.

The questions now arise, have these grants been legally esta-

blished? Were they within the competency of the persons making them? Are they binding upon the faith of the government of the United States? Does it lie within the jurisdiction of this court to render a decree favorable to the petitioners?

The copies made by the Spanish commandant from the protocol, and certified by him to be true and genuine, though dated long after the protocol, would be received in evidence in the courts of Spain, as possessing equal claims to credit as the primordial or originals. For the reason, that those like these are certified by the same officer whose attestation gives authenticity to the protocol, and who is charged to preserve it. 2 Escriche, Dic. de leg. 185. And this court for the same reason has uniformly received them, as having the same authority. United States *v.* Percheman, 7 Peters, 51; United States *v.* Delespine, 15 Peters, 319, and cases cited.

In this case the evidence of the loss or destruction of the protocol is satisfactory, and the copies would be admitted as secondary evidence upon well settled principles.

The power of the commandants of posts, in the Spanish colonies to make inchoate titles to lands within their jurisdictions has been repeatedly acknowledged by this court.

Under the laws and regulations of the Spanish Crown, it is a question of some doubt, whether grants for the purpose of grazing cattle, were any thing more than licenses to use the lands, and whether they were designed to operate upon the dominion. This question was presented in the case of the United States *v.* Huertas, 8 Peters, 475, upon a grant "with the precise condition to use the lands for the purpose of raising cattle, without having the faculty to alienate the said land by sale, transfer, control of retrocession, or by any other title in favor of a stranger without the knowledge of this government," was confirmed by a decree of this court against that objection upon the part of the government, 8 Peters, 475 – 709. We consider the question closed by the decision in that case, in reference to the country formerly held by Spain, lying to the east of the Sabine.

The land comprehended in these grants at their respective dates was within the unquestioned dominions of the Crown of Spain. The evidence clearly established that the commandants of the posts at Nacogdoches, before and subsequently, were accustomed to make concessions to lands in the neutral territory. This was not at all times an unquestioned jurisdiction, but between the years 1790 and 1800, it seems to have been generally acquiesced in. Some of the grants made within that period have been confirmed by the United States. The dispute of this jurisdiction was a dispute raised by other local commandants and had no relation to the controversy which arose

between the United States and Spain, upon the construction of the treaty of St. Ildefonso and the limits of the cession it made. Had these grants been executed after the date of that treaty, they would probably have been controlled by the doctrine of the case of the United States *v.* Reynes, 9 Howard, 127, and those of a kindred character. Having been executed by officers of the Crown of Spain, within its dominions, and in the exercise of an apparently legitimate authority, the presumption is in favor of the rightfulness of the act. No evidence has been given on the part of this government to impugn it, and much evidence has been adduced to uphold and sustain it.

The petition of the appellees describes the grants to be complete, wanting nothing to their validity from the authorities of Spain.

They have adduced evidence to show that such was the estimation in which they were held by the inhabitants of the district of Nacogdoches. If the court had adopted this conclusion it could have taken no jurisdiction of the case. Its jurisdiction under the act of 1844 is merely to supply the deficiencies in the titles, which were in their incipient state at the termination of the Spanish dominion.

The facts pleaded, enable us to determine the case without a reference to these legal conclusions of the parties. In the United States *v.* Clarke, 8 Peters, 436, this court reviewed the ordinances and regulations of the Crown of Spain for the disposition of its uncultivated lands in the Indies, so as to ascertain in whom, among its officers, the power to grant resided. From the examination, it was concluded that in 1774, it was confided to the civil and military Governors, from whom it had been for some years previously withdrawn, and that it remained with these officers till a period subsequent to the date of these grants in the territories bordering upon the Gulf of Mexico. The commandants of posts, and other sub-delegates of this officer, were charged only with a superintendence of the incipient and mediate states of the title, but the power of completely severing the subject of the grant from the public domain was uniformly retained by that central jurisdiction. We are, therefore, of the opinion, that these concessions must be treated as imperfect, and dependent upon the sanction of the United States. Upon a full examination of the evidence, we think they are sustained upon principles of equity, and that the decree of the District Court that declares them to be valid, should be affirmed.

That portion of the decree which provides that the petitioners be entitled to locate so many acres of land as have at any time been sold, or otherwise disposed of, out of said subdivisions by the United States, or any other unappropriated land belong-

ing to the United States, within the State of Louisiana, falls within the objections, stated in the case of the United States *v.* Moore, 12 Howard, 209, and of United States *v.* McDonogh, at this term, and cannot be maintained. To this extent the decree of the District Court is reversed. The effect of which reversal and of the decree rendered, is to exempt the lands sold or disposed of by the United States from the operation of the plaintiff's claim, and to leave the question of indemnity between the claimant and the political department of this government.

## Order.

This cause came on to be heard on the transcript of the record from the District Court of the United States for the Eastern District of Louisiana, and was argued by counsel. On consideration whereof, it is the opinion of this court that the grants set forth in the record are valid grants, and that so much of the decree of the District Court as confirms them should be affirmed; but that such of the lands embraced by the said grants as have been sold or otherwise disposed of by the United States are exempt from the operation of the said grants; and that so much of the decree of the said District Court as authorizes the location of so many acres of the lands embraced in the said grants as have been sold or otherwise disposed of by the United States, on any other unappropriated lands of the United States, within the State of Louisiana, is erroneous, and should be reversed.

Whereupon, it is now here ordered, adjudged, and decreed, that so much of the decree of the District Court as authorizes the location of so many acres of the land as have been disposed of by the United States on any other unappropriated lands of the United States, within the State of Louisiana, be, and the same is hereby reversed and annulled; and that the lands so sold or otherwise disposed of by the United States, be, and the same are hereby exempted from the operation of the said grants.

And it is now here further ordered, adjudged, and decreed, that so much of the decree of the said District Court as declares the said grants to be valid, be, and the same is hereby affirmed.