COHAS, Appellant, v. RAISIN and LEGRIS, Respondents.

<div style="float:right">3  443<br>87  518</div>

By the laws of Mexico, towns were invested with the ownership of lands.

By the laws, usage, and custom of Mexico, the Alcaldes were the heads of the Ayuntamientos, or town councils; were the executive officers of the towns, and rightfully exercised the power of granting lots within the towns, which were the property of the towns.

Before the military occupation of California by the army of the United States, San Francisco was a Mexican Pueblo, or municipal corporation, and was invested with title to the lands within her boundaries.

A grant of a lot in San Francisco, made by an Alcalde, whether a Mexican, or of any other nation, raises the presumption, that the Alcalde was a properly qualified officer, that he had authority to make the grant, and that the land was within the boundaries of the Pueblo.

Under the Mexican laws, municipal lands become the absolute property of the Pueblo, subject only in their disposition to the general laws of Mexico.

The occupation and subsequent acquisition of California by the United States did not suspend or determine any rights or interest of San Francisco in such lands. And if any interest passed to the Government of the United States by the said acquisition, it has been reconveyed by the Act of Congress of March 3d, 1851, entitled, "An Act to Ascertain and Settle the Private Land Claims in California."

It is too late to question the authority of an Alcalde elected in 1846.  If invalid, his acts as a *de facto* officer, must be held good by this court.

The title acquired by San Francisco, by virtue of the Act of Congress of March 3d, 1851, to the Pueblo lands, must enure to the benefit of bona fide holders under her grants.

The case of Woodworth v. Fulton is not law, and can be no farther regarded as authority.  There is no principle which compels the observance of the doctrine of *stare decisis*, when a rule well settled and universally acquiesced in, has been violated.

The Pueblo retained, during the war, all its rights to municipal lands which had been conferred upon it previous to the war.  The right to alienate is incident to that of ownership.  The fact that this right was exercised by the municipality

from 1835 to 1850 without question or restriction, would prove the usage and custom in the absence of law.

The Pueblo had the same right to dispose of its property during the war as a natural person.

All grants made by the Alcalde from the beginning of 1835 to near the end of 1839 were made by the authority of the Ayuntamiento.

The grants made by Justices of the Peace from 1839 to the end of 1843, were made by virtue of authority conferred on them in the absence of Alcaldes, by the Departmental Junto, in virtue of Art. 180 of the law of March 17, 1837.

The grants made in 1844 by Alcaldes were made by virtue of their office, as constituting the municipal government of this Pueblo, under Governor Micheltoreno's Proclamation of November 4th, 1843.

Grants made after the 15th September, 1847, must be *presumed* to be made by the authority of the Ayuntamiento, or Council, so long as that body existed.

APPEAL from the Superior Court of San Francisco.

The complaint in this case set forth, that on the 12th December, 1850, plaintiff executed a bond in favor of Lewis Legris and R. Laranchy, for $3000, conditioned, that if said Legris and Laranchy should pay to plaintiff the sum of $3000, evidenced by certain promissory notes drawn by said Legris and Laranchy to the order of plaintiff (describing the notes), plaintiff would execute and deliver to the said L. and L., at their request and expense, a good and sufficient warranty title to a piece of ground, part of lot 233 on the map of the city, &c., describing it, and thereupon said obligation should become void, otherwise in force. And if any of the notes described should not be paid on the day of their maturity, then the obligor, without further proceedings, should take back the property free of all charges. That, on the 1st March, 1851, said Laranchy assigned the said bond to Jules Raisin, and the said Raisin and said Legris are now in possession of said property. That three notes, of $300 each, due the 15th June, July, and August, have not been paid, though demanded, &c. Wherefore plaintiff prays for judgment against defendants, ordering that said property be *restituted* to him, free of costs, &c.

The defendant, Jules Raisin, answers and admits the allegations of the complaint, and the non-payment of the notes as charged. And avers that he is not bound to pay them, for that

since the payment of the $1400 (the money admitted to be paid by the complaint) he discovered that plaintiff had no title to the premises, pretended by the said bond to be sold, and cannot comply with his said covenant to execute a good warranty title for the same, which is a fraud on defendants, who therefore pray that the contract be rescinded, and for judgment for $1400, already paid by defendants, with interest, &c., and for general relief.

Sept. 15, 1851. The counsel in the case filed an agreement, in which it is admitted that at the date of the bond the plaintiff was in peaceable possession of the lot, that ever since the date of the bond the defendants have been in peaceable possession, have never been disturbed in any manner whatsoever, and that the bakery (on the lot) is at this time in full operation.

It was also agreed that plaintiff in this case claims under a grant executed by an American Alcalde, in 1847, when the United States was at war with Mexico.

The cause was heard by the court below, September, 1851, who decreed that the contract be rescinded, and that judgment for $628 19 and costs be entered for defendants.   Upon the payment of which, by the plaintiff, the defendants are hereby ordered to deliver up to the plaintiff the lot of ground and improvements described in the complaint, and that plaintiff have his writ of possession, &c.

The plaintiff appealed.

*Hubert*, for appellant.

There is no breach of warranty unless there is an actual ouster or eviction.  4 Kent's Com. 471.   Defendant in possession under plaintiff's title is estopped from questioning it.  1 Cal. Rep. 120. The covenant that plaintiff will execute a good warranty title, refers to the deed itself, and not to the title of the property.  20 Johns. 129.

*Hepburn*, for respondent.

HEYDENFELDT, Justice, delivered the opinion of the court, with which WELLS, Justice, and MURRAY, Chief Justice, concurred.

The plaintiff sued on a note which was given for part of the purchase-money of a lot. The sale of the lot was by warrantee. The defendants set up that the plaintiff has no title, and therefore cannot comply with his warrantee, and they pray a rescission of the contract. It is admitted on the record that the plaintiff derives title from the grant of an American Alcalde, which was made during the war between Mexico and the United States. This involves the consideration, whether, under the Mexican domination, towns were invested with property in lands, whether Alcaldes of towns had power to grant, and if so, whether the qualifications of the officer, and the circumstances of the country at the time of the grant, will affect its validity.

The laws of Spain fully recognize the right of cities, towns, and villages, to acquire and dispose of real estate, subject to the royal regulations, which were made from time to time for their government. And when once acquired, neither the king nor his officers can take away or grant to others any of these municipal lands. "Our will and pleasure is, that cities, towns, and villages shall retain their rights, revenues, and municipal lands (propios), and that no grants be made of them, and we command that all grants of the same, or any part thereof which we may make to any person, be of no value whatever." Novissima Recopilacion, Lib. vii. Tit. 16, Law 1. In Law 2 of same title and book, the king directs that all municipal lots occupied by any person, without paying an equivalent or rent, be forthwith returned to said cities, towns, and villages. "And if any charters or grants of this property have been made by the king's own ancestors, or by ourselves, we further command that they be of no value, and that they be neither obeyed nor fulfilled."

The manner of granting municipal lands to towns, and the manner in which they were allowed to rent or dispose of them, depended on royal regulations, which were changed from time to time. At one period they could grant or sell them, and at another, they could only lease them, either for a term of years or forever, the rents forming a fund for municipal expenses. But these grants, sales, and leases were always made by the municipal authorities, with the permission of the crown, but neither the king nor the crown officers could themselves dispose of the lands

once granted or acquired by the towns.   In forming new towns, the viceroys were directed, not only to make out to them common lands, but also to give municipal lands (propios) to those who had none, "the proceeds of which will serve to pay the corregdors;" Recopilacion, Lib. iv., Tit. 7, Law 14.   In some of these orders and decrees, the municipal authorities were allowed to alienate the municipal domains only in case such measures were necessary for the good of the towns.   In others they were forbidden to sell, and directed to lease only.

At one time, these towns were governed by Cabiladors, at others by Corregidors, and again by Ayuntamientos, composed of Alcaldes and Regidors.   At the same time, the municipal government of different towns varied from one another.

On the founding of new towns in California, the population being too small to authorize Ayuntamientos, the granting of town lots was confided to the governors, the commandants, and to the captains of Presidios.   *Vide*, Orders and Regulations of 1773, 1779, and 1791; En. Doc. 1850, pp. 133, 135, and 139.

In 1812 and 1813, the Cortes authorized the establishment of Ayuntamientos, in towns which had not before had that right, they also authorized the municipal lands (propios), as well as royal lands (realengos), "be reduced to private ownership."

The grant of lots in Pueblos, were to be made by the "*Ayuntamientos Constitutionale* of the Pueblos, to which the land belonged;" all grants made, were to be *in full property*.   Law of January 4th, 1813, sec. ix. ; *vide* Leges Vigentes, p. 58.

Other laws fixed the organization of these Ayuntamientos according to the population of the towns, but in all cases, the first Alcalde was the presiding and executive officer of the municipal council.   In the colonization law of 1824, it is expressly stated, that the "objects of this law, are the lands of the nation, which are not private property, nor belong to any corporation or Pueblo, and can therefore be colonized;" thus fully recognizing the right of ownership in the Pueblos, to the land acquired by them, either by grant or purchase.

On the 6th of August, 1834, the Territorial Deputation of California, authorized Ayuntamientos of towns to apply for

(egidos) common lands, and (propios) municipal lands, to be assigned to each Pueblo.

"Art. 2. The lands assigned to each Pueblo, for municipal lands (propios), shall be subdivided into middling sized and small portions, and may be rented out or given at public auction, subject to an enphitritic rent, or ground tax, &c."

"Art. 3. For the grant of a house lot, for building on, the parties shall pay six dollars and two reals, for a lot of 100 varas square, &c." En. Doc. 1850, p. 123. By the law of August 9th, 1834, Art. 5th, municipal lands were to be granted to the new Pueblos, formed out of the secularized missions, p. 150.

On the 3d of November, 1834, the Territorial Deputation of California, decreed that the Governor should direct the election of an Ayuntamiento in the Partido of San Francisco, to be composed of one Alcalde, two Regidors, and one Sindico. This Ayuntamiento was directed to mark out in the shortest time, the boundaries or limits of its municipality. (The original of this decree, is of record in the Surveyor-General's office, and the original order of the government, in the Alcalde's records. It is translated in Wheeler's Land Titles, p. 12.)

The Ayuntamiento was elected in December, 1834, as shown by the records : and it must be *presumed* that the Ayuntamiento did its duty, in marking out the boundaries as directed, especially as they immediately commenced making grants of the lands.    5 Cranch, p. 242; 3 Wheaton, p. 594; 3 Peters, p. 320.

The first grants made by the Alcalde in 1835, were lots 100 varas square, as authorized by the law of August 6th, 1834 ; but in the same year, Jose Joachim Estudillo applied to the Governor, for a grant of 200 varas square. This petition was referred by the Territorial Deputation, to the committee on municipal lands, which reported that the grants of house lots ought to be limited to 100 varas square.

In reply to this petition of Estudillo, which had been forwarded by the Alcalde, the Governor wrote to the Alcalde, that Ayuntamientos had power to grant lots of 100 varas square, at not less than 200 varas from the sea-shore; and to inform the people of this Pueblo, not to apply to the Governor for grants,

but to the Ayuntamiento, to whom that power belonged. The original proceedings in this case are of record in the Surveyor-General's office.

By the former laws of Spain, by the usages and customs of the country (and by special law of March 17th, 1837), the Alcalde presided over the Ayuntamiento, and was the executive officer, to carry into effect its resolutions and orders.

Hence all grants of lots made in San Francisco, from the beginning of 1835 to the latter part of 1839, were made and signed by the Alcalde,—he being the first member, president, and executive officer, of the Ayuntamiento. Some of his grants read: "By virtue of the authority in me vested, by the most illustrious Ayuntamiento, I hereby grant," &c., others simply, "By virtue of authority in me vested, I hereby grant," &c.

In 1839, it was thought by the governor, that the number of the population in San Francisco, being greatly reduced by the secularization and partial ruin of the mission, was not sufficient to authorize the maintenance of an Ayuntamiento, and *Juezes de Paz* were elected in place of that body, as directed in the law of March 17th, 1837.

These *Juezes de Paz* commenced making grants of 100 vara lots, in the same manner as had been done by the Alcaldes. But a question now arose, whether the justices could, under the law of 1837 (*vide* acts 180–186), exercise that power in place of the Alcalde, without a special ordinance of the departmental Junta. To remove this doubt, a special ordinance was passed, and communicated by the governor through the prefect, but limiting the grants by a justice, to 50 varas square. (The original of this communication is in the archives, and bears an earlier date than the letter of the sub-prefect, printed by Wheeler, p. 15.)

The grants made by the justices of the peace at this period, are generally, "By virtue of the superior order of the departmental government, I hereby grant," &c.

In November, 1843, Governor Micheltorena, clothed with the extraordinary powers conferred on him by the President under the Bases of Tacubaya, changed the municipal organization of San Francisco, and directed the election of alcaldes, of first and second nomination.

These alcaldes not only took the place of the former ayunta-mientos, but exercised all the powers conferred on the prefects.

This municipal organization continued to the time of the military occupation of the country by the United States,—hence the grants made from the beginning of 1844, are made in the name of, and signed by, the "Alcalde." It is true, that in 1846 the Alcaldes sometimes signed themselves as *Juez de Paz*, but he was elected as *alcalde*, and addressed as *alcalde* in all official communications of the governor.

In places where there was an alcalde, the powers of a *Juez de Paz* were limited to matters of police, and the trial of petty offences, &c.

The forces of the United States took possession of Monterey on the 7th day of July, 1846, and subsequently of the other portions of Upper California.

The President of the United States directed the officers taking possession of Upper California, to organize a civil government, and advised, that "it would be wise and prudent to continue in their employment, all such of the existing officers, as are known to be friendly to the United States."

In accordance with this authority, and in the absence of the Mexican alcaldes, who had left their posts, a new election was called in San Francisco on the 15th of September, 1846. At this election, an American was elected first alcalde, and a Mexican was elected second alcalde.

These offices continued to be filled by elections, or, in case of temporary vacancies, by executive appointments, until the organization of the state government, and repeal of the Mexican laws. In 1847, the increase of population was deemed sufficient to authorize an election of regidors or councilmen, which took place on the 15th of September. This body also continued with new elections, until the charter of 1850, of the City of San Francisco.

From this summary we must infer, 1st. That all grants made by the alcalde, from the beginning of 1835 to near the end of 1839, were made by the authority of the Ayuntamiento.

2d. That the grants made by justices of the peace, from 1839 to 1843, were made by virtue of authority conferred on

them, in the absence of alcaldes, by the Departmental Junta, in virtue of Art. 180, of the Law of March 17th, 1837.

3d. That the grants made in 1844, 5, 6, and beginning of 1847, by alcaldes, were made by virtue of their office, as constituting the municipal government of this Pueblo, under Governor Micheltorena's Proclamation of November 14th, 1843.

4th. That grants made by alcaldes after the 15th of September, 1847, must be presumed to be made by the authority of the ayuntamiento or council, so long as that body existed.

I now come to the particular consideration of the effect of grants made after the military occupation of this country, by the forces of the United States.   The defendant considers this as an adjudicated question, and cites the case of Woodworth *v.* Fulton, 1 Cal. Rep., as decisive.   Such would certainly be the case, if we were to consider ourselves bound by that decision. But, however great is my regard for the doctrine of *stare decisis*, there is certainly no principle which compels its observance, where a rule well settled and universally acquiesced in has been violated.

In that case, as affecting the present question, the court assumed:—

1st. That San Francisco was not a Pueblo.

2d. That, conceding it to be a Pueblo, there was no legislation, general or special, which vested in it the title to land.

3d. That if the title to land was vested in it, then, the alcalde, who was an alien enemy to Mexico, and without authority from the American government, had no power or right to interfere with that vested estate.

In the subsequent case of Reynolds *v.* West, 1 Cal. Rep. 323, the opinion was given by the same judges who decided Woodworth *v.* Fulton.   The question was, as to the validity of a grant in San Francisco by a Mexican alcalde, before the war. The title was sustained, and, of course, operated as an abandonment by the court of the first two grounds I have stated, as taken in the case of Woodworth *v.* Fulton.

I have shown before, in this opinion, that Mexican towns were invested with property in lands; that by the Mexican decrees, providing for the secularization of the missions, it is shown that

San Francisco was a mission; that the missions were required to be converted into Pueblos. , That by the law of August 9th, Art. 5, municipal lands were to be granted to the new Pueblos, formed out of the secularized missions; and the direction, in 1834, of the territorial legislature, for the formation of an Ayuntamiento of San Francisco, with directions to fix its boundaries.

The only question, then, remaining to sustain the decision of Woodworth v. Fulton is, that the alcalde who made the grant, was an American and not a Mexican citizen. ,

It will be remarked, from what has preceded, that these are not grants of any portion of the public domain, made by officers of the conquering power, but are grants of municipal lands, made by the regularly authorized municipal authorities, under the laws, usages, and customs of the country, which were not changed, or interfered with, by the military or de facto government, organized under the laws of war.

It will not be denied, that the Pueblo retained during the war, all its rights to municipal lands, which had been conferred upon it previous to the war; and as all grants of land made to it, must have been in full property, the right to alienate was incident to ownership. The fact, that this right was exercised by the municipality, in its different forms, from 1835 to 1850, without question or restriction, would prove the usage and custom in the absence of the law.

The Pueblo had the same right to dispose of its property during the war, as a natural person. It is immaterial whether the election or appointment of these municipal officers was legal or not, or whether the individuals possessed the legal qualifications for holding these offices. They were de facto the officers of the town, universally acknowledged, recognized, and obeyed as such, and their acts under the law within the sphere of power connected with the office must be binding. The rule of the common law is laid down to be, that the acts of an officer de facto, whether judicial or ministerial, are valid, so far as the rights of the public and third persons are concerned, and neither the title of such officer, nor the validity of his act as such, can be indirectly called in question, in a proceeding to which he is not a party.

The legal presumption is always in favor of his authority. See Plymouth *v.* Painter, 17 Conn. 585; Hoodland *v.* Calvert, 1 Spencer, 387; F. & M. Bank *v.* Chester, 6 Humph, 458; Lowell *v.* Flint, 7 Shep. 401; Burke *v.* Elliott, 4 Iredell; Gillvain *v.* Reddick, 4 Iredell; Schlenker *v.* Bisley, 3 Scam. 483; Cornish *v.* Young, 1 Ashmead.

It results from these authorities, and the reasoning upon which they are based, that the doctrine laid down in Woodworth *v.* Fulton is not law, and cannot be any farther regarded as authority.

We have come to the conclusion, and so announce as our decision,—

1st. That by the laws of Mexico, towns were invested with the ownership of lands.

2d. That by the law, usage, and custom of Mexico, the Alcaldes were the heads of the Ayuntamiento or town councils, were the executive officers of the towns, and rightfully exercised the power of granting lots within the towns, which were the property of the towns.

3d. That before the military occupation of California by the army of the United States, San Francisco was a Mexican Pueblo, or municipal corporation, and was invested with title to the lands within her boundaries.

4th. That a grant of a lot in San Francisco, made by an Alcalde, whether a Mexican, or of any other nation, raises the presumption, that the Alcalde was a properly qualified officer, that he had authority to make the grant, and that the land was within the boundaries of the Pueblo.

The judgment is reversed, and the cause remanded.