## UNITED STATES *vs.* VALLEJO.

1. The decree of the Spanish Cortes relative to crown lands passed in 1813, being inapplicable to the state of things which existed in Mexico after the revolution of 1820, could not have continued in force there unless expressly recognised by the Mexican Congress, and not then without being essentially modified.

2. The Spanish system of disposing of public lands was very different from that provided for by the Mexican law of 1824, and the regulations of 1828. The two laws being repugnant and inconsistent, the former was repealed by the latter.

3. The law of 1824 and the regulations of 1828 are the only laws of Mexico on the subject of granting the public lands in the territories, (excepting those regulating towns and missions,) and the authority of the governors and other officers is defined by them.

4. A paper, purporting to be a grant of public land, but not registered, recorded, or noted in the proper book, is inconsistent with the known practice of every well regulated government, which requires that all such acts shall be enrolled.

5. A false note of the attesting secretary at the bottom of the grant, to the effect that it has been registered, is a serious objection to the claim under it.

Don Mariano Guadalupe Vallejo petitioned the Land Commission at San Francisco for confirmation of his claim to the tract known by the name of *Suscol*, bounded on the north by Tulucay, and Suisun on the east, and south by the Straits of Carquines, Mare Island, and Napa Bay. It includes the city of Benicia, the town of Vallejo, the navy-yard of the United States, and the depot of the Pacific Steamship Company, and contains altogether about eighteen square leagues.

The documents introduced to show title in the claimants were: 1. A colonization grant to Vallejo, dated 15th March, 1843, in the usual form, and with the usual conditions, signed by Micheltorena as Governor, and countersigned by Francisco Arce as Secretary *ad interim*. 2. Another grant, bearing the date of June 19, 1844, reciting that Vallejo had requested the

purchase of the tract for the sum of five thousand dollars; that the Governor had sold it to him for that sum, and received payment; and declaring him to be owner of the land without restriction. This paper also purported to be signed and countersigned by Micheltorena and Arce. 3. A certificate dated 26th of December, 1845, signed by Pio Pico as Governor, and attested by José Maria Covarrubias, setting forth that both the grants above mentioned had been approved by the Departmental Assembly on the 26th of September, 1845. These papers were all produced from the private custody of the claimant himself. Neither of the grants is referred to in Jimeno's catalogue, or recorded in the Tomà de Razon, nor is any espediente found for either of them among the archives. The journals of the Departmental Assembly show that these grants were not before that body, either on the 26th of September, 1845, as certified by Pico, or on any other day. The following official letter, dated at Angeles, March 16, 1843, addressed to "Colonel D. Guadalupe Vallejo, military commandant of the line from Santa Juez to Sonoma," signed *Micheltorena,* and sealed with the seal of the Departmental Government, was also produced by the claimant, and proved to be authentic by reference to the recorded correspondence of the Governor for the period to which it belonged:

"I transmit to you the title of the place named Suscol, this Government regretting that it cannot accept the first of the offers which you made; because the supreme government of the nation has ordered that all back pay be suspended, which became due before the 1st of October, 1841, which will serve you as a rule with respect to your subordinates; which suspension was made to continue until the public treasury should be released from its embarrassments, and by which even I had to suffer a loss of a considerable amount, of some thousands of dollars; but I do accept the offer of the five thousand dollars in articles of the produce of the country for the troops, on account of the imperious necessity which I have for them, in order to maintain them, for which purpose I send the schooner California, that you may have the goodness to load her with

five hundred fanegas of maize, two hundred and fifty of fijoles, two hundred arrobas of dried meat, and five hundred pairs of shoes, or the material for making them, which I am told it will not be difficult for you to send; and surmising also that it will not be very inconvenient for you, I earnestly request that you will send me two thousand dollars in silver, in consideration of the fact that the treasury of the department is short of funds, as it has not received anything since my arrival, there having been no arrivals of vessels; and besides this, the troops of my expedition are daily furnished with cash in hand, as they are subject to a mode of payment, administration, and customs different from the presidial troops, as you know, in the same manner as the rest of the national army, and for which sum it will be exceedingly grateful. All of which I communicate to you for your information, assuring you at the same time of my consideration and esteem. God and Liberty!"

J. B. R. Cooper testified that he was captain of the California, a goleta or schooner of eighty-five tons burden, belonging to the department, and used to carry mails, troops, and supplies up and down the coast; that about the year 1842, or 1843, he took a full cargo of supplies, consisting of wheat, corn, barley, beans, peas, blankets, tanned leather, shoes, and deer skins, from Petaluma to San Diego; that these supplies were for Governor Micheltorena, and furnished by Vallejo; that the Governor told him Vallejo had offered $20,000 for Suscol, and the witness understood these supplies were to go in payment.

Four witnesses (but the character of one was impeached) testified that the ranch was occupied by Vallejo for a long time before, as well as after, 1843; they speak of no occupancy by any other person, and say that he had buildings on it, many thousands of horses, cattle, and hogs, with extensive cultivation. It appeared, however, that the ranch was originally used by the mission of San Francisco Solano, and the first improvements on it were made by the padres. In 1839 it was taken by the Government for military purposes, and it was under the supervision of Colonel Vallejo, because he was the commandant of the northern frontier, with his headquarters at Sonoma

and his private residence near by, at Petaluma. Three witnesses on the part of the United States testified that they knew the land; that it was called the "Rancho Nacional;" that it was occupied and cultivated by soldiers of the Mexican army down to the time of the American conquest, when they were driven away; that all the stock upon it was public property, and used as such to supply the soldiers with beef, &c.; and that Vallejo had possession of it for the Government as a military officer; but they never heard of any private claim to it until long after the conquest.

. . Watson, a witness produced by the United States, swore, that in 1848 he proposed to purchase a part of the land from Vallejo, and Vallejo then told him that he had bought it from the Suscol Indians; but he expected the United States Government would swindle him out of it, and refused, for that reason, to sell with a warranty of title.

The evidence given by the claimant to establish the authenticity of the grants was contained in the deposition of Pablo de la Guerra, who declared on his oath that he knew the handwriting of Micheltorena and Arcé, and that their signatures to the two grants were genuine, to the best of his knowledge and belief. Arce, the attesting and official witness, was not called. After the evidence was closed and the cause submitted, a motion was made on the part of the United States to open it for the purpose of calling Arce on their part. This motion was founded on two affidavits expressing the belief of the affiants that Arce would prove the grants to be false. It was resisted, and the court refused to take off the submission.

The claimant took the deposition of I. D. Marks, who testified to conversations with Micheltorena in Mexico after he was Governor of California, in which Micheltorena told him that he had extraordinary powers as Governor, and that his acts had been approved. The same witness was also told by José Fernando Ramirez, Secretary of State of Mexico, that full powers to grant lands in California had been delegated to Micheltorena by Santa Anna, under the Bases of Tacubaya.

The District Court affirmed the decree of the Land Com-

mission, approving the title and confirming the claim for the whole tract described in the petition; whereupon the United States took this appeal to the Supreme Court.

*Mr. Black,* of Pennsylvania, and *Mr. Green,* of Missouri, for the United States. Both these grants are destitute of what the court has often held to be indispensable—namely, a record. The grant of 1843 is not on Jimeno's index, and that of 1844 is not on the Toma de Razon. Neither is there an espediente for either of them. These defects are so clearly fatal, that an argument concerning them is useless. The absence of a registry and an espediente, prove that no such grants were ever issued. The journals of the Departmental Assembly show that the certificate of approval is also a sheer fabrication.

The evidence in support of these grants would be wholly insufficient to establish even a private paper. The claimants called Pablo de la Guerra to prove the handwriting of the signatures, and did *not* call Arce, who was in full life, and within the jurisdiction of the court. Nay, when the claimants closed the evidence without calling the subscribing witness, the United States proposed to call him, but the motion was successfully resisted. This court is bound to presume that the claimants kept away the only witness in the world who knew when, how, and by whom the papers were made, for fear that the truth, if told, would overthrow their case. The law does not allow any other construction to be put on such conduct.

The only genuine paper produced is the letter from Micheltorena to Vallejo. But it is really inconsistent with every part of the case which the claimants have attempted to make out. It refers to a title for the place called Suscol. What title? In whose favor? It is dated the day after the first grant, and more than a year before the other. Would the Governor have made a colonization grant if he intended to sell? And after making a bargain to sell, would he transmit a title reciting a naked grant, without a consideration, before he received the purchase money? Of the two offers, which the Governor says Vallejo has made him, neither is intelligibly defined. He says he cannot accept the first, because back pay

is suspended; but he accepts the offer of $5,000 in produce, and he urgently requests that Vallejo will send him $2,000 besides in silver. There is not a word in all this to indicate that the offers had any reference to the land. No doubt Vallejo was in debt to the Government; Micheltorena was dunning him, and Vallejo was offering to set off his back pay or to discharge a part of the claim in produce. The latter proposition the Governor acceded to, but insisted at the same time on having some cash besides. If the other side of the correspondence had been produced—that is, Vallejo's letter containing the offers—the whole could have been understood. Why was it kept out of sight? For the same reason that Arce's testimony was withheld—the truth did not suit the purpose.

Three other grants with which Vallejo was connected are referred to as throwing light on this one: the *Petaluma Sobrante*, concerning which the evidence is found on this record; the *Lup Yumi*, (22 How., 392;) and the *Yulupi*, (22 How., 416;) which have been already investigated in this court. These three grants, together with that for *Suscol*, are all dated in 1844; all- countersigned- by Arce; none of them is recorded, and are all falsely certified to have been recorded. Here is a printed copy of all the grants, dated in 1844, on which claims were set up before the Land Commission, (Limantour Exhibits,) and it shows that Jimeno was at his post during the whole of that year, and attested every registered grant except one to himself. It is worthy of notice, too, that Arce was never called as a witness to prove any of the unregistered grants to which his name is appended.

The power of the political chief was limited by the colonization laws of 1824 and 1828, and they give him no power to *sell* lands; nor had he any authority either to give or sell lands which were not vacant, but occupied and used like this Rancho Nacional, by the Government, for its special and necessary purposes. The effort to change the law by proving the loose conversations of Micheltorena and Ramirez is, of course, unavailing. A book was cited by the judge below entitled *Leyes Vigentes*, published at Mexico, and page 58 is referred to. Here is *Leyes Vigentes*, and here is page 58. It contains a decree of

the Spanish Cortes made in 1813 on the subject of the crown lands, but not a word affecting this question in the remotest degree. The provisions it does contain are inconsistent with, and therefore repealed by, the law of 1824.

But, assuming that the Governor had a power not given by the colonization law, and conceding that he could sell a public ranch occupied for military purposes, does it follow that he could convey it without making his act a matter of record? On general principles this must be answered in the negative. A grant not recorded is but the private deed of the officer who makes it, says Judge *Grier* in *Luco's* case. In every well regulated Government, the deeds of its officers are enrolled, says Judge *Campbell* in *Sutter's* case. A private deed made by a public officer for a part of the public domain, upon a consideration paid to the officer himself, is not binding on the public either in law or equity.

The opinion of the judge below is based on a mistaken view of the law, and on erroneous assumptions of fact, to wit: that the title-papers were *admitted* to be genuine; that there was a money *consideration* paid for the grant, and that *possession* was taken as ordinary under Mexican law. This is wholly wrong. There was no such admission; the grant was denounced as false from first to last, and the record shows it. There is no reliable evidence that a penny was ever paid for it; and no possession was ever given or taken according to any law, custom, or usage.

*Mr. Reverdy Johnson,* of Maryland, and *Mr. McCalla,* of Kentucky. The genuineness of these title-papers was admitted. The statement of that fact in the written opinion of the court below is not only ample, but conclusive evidence of it. This being settled, the United States will not be permitted here in the appellate court to raise the question again. Besides, the evidence was sufficient without the admission to show that the papers were executed. The non-production of an espediente and the failure to call Arce are not, under the circumstances of this case, any grounds for rejecting the claim here. The want of a registry does not prove that the titles

*United States* vs. *Vallejo.*

were not issued. As to the certificate of approval by the Departmental Assembly, it makes no difference whether that be true or not, for an approval is not necessary to the validity of the title.

The counsel of the other side rely upon the cases in which the court has decided against claims under colonization grants. This claim is under a *sale* made by the Government to a citizen for a consideration paid, and is, therefore, not within the principle of those cases. The law of 1824 and the regulations of 1828 do not apply to it.

The power of the Governor to make such a sale is not a thing to be doubted. It existed anterior to the colonization law of 1824, and was not taken away by that law. The testimony of Marks shows that it was claimed and exercised by Micheltorena, and that it was conceded by the official authorities of the Supreme Government.

But even if the Governor had transcended the strict limits of his legal authority, yet, as it was made on a valuable consideration, it constitutes an equitable claim which ought to be confirmed. A title that would have been confirmed by the Mexican Government will be confirmed here; and this court is bound to presume that Mexico would confirm any title which in good conscience ought to be confirmed. With what regard to her faith and honor could Mexico refuse to admit the justice and honesty of a title which was paid for by the grantee, and of which she had the price in her treasury, or applied it to the public service? It would be monstrous to suppose that she could quibble with one who had paid her his money about the technical form in which his contract was made.

The letter of Micheltorena to Vallejo is admitted to be genuine. That letter, taken in connection with Cooper's evidence, shows very conclusively that an honest and fair price—the price demanded by the Government—was paid for the land in question.

General Vallejo was one of the most distinguished men of the Mexican Republic; performed for many years the most important and valuable services, and was highly appreciated by the Supreme as well as the Departmental Government. He is

now one of the most respectable citizens of California. His character makes it impossible to suppose that he would assert a claim to land which was not his own. In point of fact, no such suspicion as to this title ever entered the minds of Californians. They knew it was all right, and in that conviction large numbers of persons have bought these lands. Thousands are interested in the confirmation, and there is no opposing interest which deserves the slightest favor.

Mr. Justice NELSON. This is an appeal from a decree of the District Court of the United States for the northern district of California.

The claim of Vallejo and his assigns covers a tract of land known by the name of Suscol, in the county of Solano, California, bounded on the north by lands named Tulucay and Suisun, on the east and south by the Straits of Carquines, Ysla del a Yegua, and the Estero de Napa, without any limitation as to quantity, and embraces from ninety to one hundred thousand acres, including Mare Island, on which the United States have established their navy-yard on the Pacific, and the city of Benicia, situate on the bay of San Francisco. Two grants of the tract to Vallejo were given in evidence—one a colonization grant, dated 15th March, 1843, and the other a grant founded on a sale for the consideration of $5,000, dated 19th June, 1844. Both grants purport to be signed by Micheltorena, Governor, and Francisco Arce, Secretary *ad interim.*

From a letter of Micheltórena to Vallejo, 16th March, 1843, one day after the date of the colonization grant, in which he states that he transmits to him a title for the place named Suscol, and that he accepts the offer to pay $5,000 for the same, it is reasonable to conclude that the colonization grant was intended to be founded on the contract of sale; and doubting, perhaps, that the grant could not be maintained in this form, the second was executed without any reference to the colonization laws.

A paper purporting to be a decree for the formal approval of these two grants by the Departmental Assembly, dated 26th

September, 1845, and signed by Pio Pico, and José Ma. Covar-rubias, Secretary, is in the record, but there is no evidence of its genuineness. It seems to have been given up as spurious.

The evidence of possession and cultivation is slight. Indeed, considering the magnitude of the tract granted, it is entitled to very little weight. As the grants were dated 1843 and 1844, and the country taken possession of by this Government in 1846, there could be but two or three years' possession or occupation under them at the time of our taking possession. The evidence that Vallejo occupied and cultivated the tract previous to the grants, which, of itself, is slight and unsatisfactory, is still further weakened by the fact, which is shown, that the ranch had been occupied by the claimant as a military commandant with soldiers and Government property.

The witnesses, who speak of the possession as early as 1841, might very readily have confounded this possession for the uses of the Government with a possession for Vallejo himself. We can give very little weight to a possession so limited as to duration and in extent, when offered in support of a grant of ninety or one hundred thousand acres of land. If the grant cannot be maintained by its own force and effect, this possession will scarcely uphold it. Coming then to the grants, we may as well lay aside the first one, the colonization grant, at once, as entirely defective within the law of 1824 and the regulations of 1828. The only document in evidence is the naked grant itself. It would be a waste of time, after the numerous cases in this court on these titles, to go over the objections to this source of title.

The next is the grant founded on the sale, and which is the only one entitled to consideration.

The main objection to this grant is the want of power in the Governor to make it; and this raises the question, whether or not the Governor possessed any power to make grants of the public lands independently of that conferred by the act of 1824 and the regulations of 1828.

The Mexican Congress, after the country had thrown off the government of Spain, and had erected a new and an independ-

ent government in its place, representing the sovereign power of the nation, passed the law of 1824 providing for the grant and colonization of the public lands.

The second section provides that the lands of the nation, which are not the property of any individual, corporation, or town, are the subject of this law, and may be colonized. Section third: For this purpose the Congress of the States shall, with the least delay, enact laws and regulations for colonizing within their respective boundaries, conforming in all respects to the *constitutive act*, the *general constitution*, and the *rules estab-lished in this law*.

The act then prohibits the colonization of any lands within twenty leagues bordering on any foreign nation, or within ten leagues of the sea-coast, without the consent of the supreme government; and further, that in the distribution of the lands preference is to be given to Mexican citizens; that no person shall be allowed to obtain a grant of more than eleven leagues; and that no person who may obtain a grant under the law shall retain it if he resides out of the limits of the republic.

The sixteenth section then provides, that the Executive shall proceed, in conformity with the principles established in this law, to the colonization of the Territories of the republic.

The Supreme Executive Government, acting under the above sixteenth section, on the 21st November, 1828, established regulations for the granting and colonization of the public lands in the Territories, and, among others, in California.

The first section declares, "that the political chiefs (the Governors) of the Territories are hereby authorized to grant vacant lands within their respective Territories," "to either Mexicans or foreigners who may petition for them, with the object of cultivation or settlement. Said grants shall be made according to the laws of the general Congress of 18th August, 1824, and under their qualifications."

Then follows a series of preliminary proceedings, specially enjoined for the purpose of ascertaining the fitness of the petitioner to receive a grant, and also of ascertaining if the land asked for may be granted without prejudice to the public or individuals; and it is declared, in view of these, the Governor

will grant or not the land; but if the grant is made, it must be in strict conformity with the laws upon the subject, and especially with reference to the law of 1824; and the grants made to individuals or families shall not be definitively valid without the previous consent of the Departmental Assembly.

Section eighth. The grant petitioned for having been definitively made, a patent, signed by the Governor, shall be issued, which shall serve as a title to the party, expressing therein that the grant has been made in strict accordance with the provisions of the law, by virtue of which possession shall be taken; and section nine, of all petitions and grants a record shall be made in a book kept for that purpose, with the plats of the land granted.

There are many other stringent provisions and conditions imposed which it is not important to refer to specially; it is sufficient to say, that the system thus established by the sovereign power of the nation for the grant and distribution of the public lands, exhibits a deliberation and care over the subject that is in striking contrast with the system of granting the public lands under our Government, and furnishes the highest evidence of the extreme interest the Mexican Government took in guarding against impositions and frauds, by or upon the political chiefs in the execution of the law.

Now, the above are the only laws of the Mexican Congress passed on the subject of granting the public lands, with the exception of those relating to the missions and towns, which have no bearing upon the question. No others have been produced on the argument, nor have our researches found any, nor were any others discovered by the public agents which were authorized by this Government to inquire particularly into the subject. (See Halleck's Rep., March 1, 1849, Exec. Doc., 1st Sess. 31st Cong., p. 119; Jone's Rep., April 10, 1850, Senate Doc., 2d Sess. 31st Cong., p. 18; see also Calif. 3 Rep., pp. 23, 24, 25; ib., 37, 38; 20 How., 63; 21 ib., 177; 23 ib., 315; 24 ib., 349.)

The ground taken to uphold this grant concedes that no other power has been conferred upon the Governor by any express act of the Mexican Congress; but it is insisted that the

law of 1824, and regulations of 1828, did not repeal the power, if it previously existed, to make a grant of the public lands by sale for a pecuniary consideration; and the decree of the Spanish Cortes, of January, 1813, is referred to as confirming that authority.

But any one looking into this law will see that it provides for a very different system of disposing of these lands from that found in the Mexican law of 1824, and the regulations of 1828; and unless specifically recognised or excepted, would necessarily be repealed as repugnant and inconsistent with the system adopted. After providing for the reduction of the public lands to private ownership in the way and with the qualifications stated, the act declares, that half of the vacant and crown lands of the monarchy shall be reserved as a security for the payment of the national debt, and of those to whom the nation is indebted, who are inhabitants of villages to which the lands are adjacent; and provision is made for the distribution of them to the public creditors belonging to these villages; also for distribution among the officers and soldiers of the army; and then provides, that the location of these tracts shall be made by a board of magistrates of the villages to which the lands are adjacent, and the proceedings are afterwards to be sent to the provincial deputation for approval.

The law then provides for grants of the residue of the vacant or crown lands to every inhabitant of the villages who ask for them for the purpose of cultivation, and has no land of his own. The patents are to be made by a board of magistrates free of charge, and the provincial delegation are to approve of them. The decree was to be published not only among all the people of the kingdom, but among the national armies, and in every way, so that it might come to the knowledge of all the subjects.

This law may be very properly referred to as the foundation and source of many titles to the public lands in the Mexican Government, and also of titles in the province or Territory of California, if any were derived under it during the authority of the Spanish Government. The change of Government would not affect them. But grants made after this change, and the

establishment of a new and independent Government, present a very different question. Grants under this law were to be made to the creditors, officers, and soldiers of the old Government. They were called *rewards for patriotism*, and were not to be extended to individuals other than those who may serve or who have served in the present war, (war between the Emperor Napoleon and Spain then existing,) or in quelling disturbances in some of the provinces beyond sea. Individuals, not military men, who had served in their districts, or contributed in any other way in this war, or in the disturbances in America, and who were injured or crippled, or disabled in battle, were included in the grants to be made. Serious disturbances existed in the vice-royalty of Mexico at this time, arising out of revolutionary struggles, headed by Hidalgo Morelos and Bravo. One of the objects of the law was to compensate and encourage the defenders of the mother Government against these revolutionary movements.

Without pursuing the inquiry further, we think it quite clear that this law could not have been in force after the change of Government, unless expressly recognised by the Mexican Congress; and not then, without being first essentially modified in its policy and purposes; and certainly, unless thus modified, and the power in express terms conferred on the political chiefs of the Territories to grant the public lands on sale, no such power can be derived from its provisions.

There are other serious objections to this claim. It is directed in the title-paper that a "note be made of it in the respective book;" and the Secretary *ad interim* declares at the foot of the grant, "note has been made of this title in the respective book." The grant, as we have seen, was made 19th June, 1844. The book of records of that year is in existence, and in good condition. No record was made of the title. The note of the Secretary is untrue. It was well said, in *The United States* vs. *Sutter*, (21 How., 175,) that "in every well-regulated Government the deeds of its officers, conveying parts of the public domain, are registered or enrolled, to furnish permanent evidence to its grantees of the origin of their title." An exemplification of such a record is admissible as evidence of

*United States* vs. *Vallejo.*

the same dignity as of the grant itself. (5 Peters, 233; 15 How., 1.)

This rule exists in States which have adopted the civil law. In those States the deed is preserved in the archives, and copies are given as authentic acts—that is, acts which have a certain and accredited authority and merit confidence. The acts thus preserved are public instruments, and all doubts that arise upon the copies that may be delivered are resolved by a reference to the protocol from which the copies are taken, and without which they have no authority.

We add, it is important, also, that a record should be made of these grants, so that the Government may be advised in respect to the portions of the public domain that have been sold or disposed of, and as a security against the frauds of the public officers upon whom the power of making the grants has been conferred. Grants of this description, when made in due and orderly form, are either made at the seat of government, where the public records are kept, and a record can be readily made, or, if signed by the public officer residing at a different place, are not deemed grants till the proper record is made.

Without this guard, the officers making the grants, as, in the present instance, the Governor and Secretary, would be enabled to carry with them in their travels blank forms, and dispose of the public domain at will, leaving the Government without the means of information on the subject till the grant is produced from the pocket of the grantee.

Without pursuing the examination further, in every view we have been able to take of the case, we are satisfied that the grant is one that should not be confirmed, and we shall order the judgment below to be reversed, and the record remitted to the court to enter judgment for the United States.

Mr. Justice GRIER. I cannot consent, by my silence, that an inference should be drawn that I concur in the opinion just delivered. I cannot agree to confiscate the property of some thousand of our fellow-citizens, who have purchased under this title and made improvements to the value of many

millions, on suspicions first raised *here* as to the integrity of a grant universally acknowledged to be genuine in the country where it originated. I do not intend to enter into any argument with my brethren of the majority. If they are satisfied with the conclusion, the presumption is, that the minority is mistaken. And I would not wish to weaken any arguments that may be urged to justify this wholesale confiscation. I shall merely mention a few of the facts and principles on which I have been constrained to dissent.

This Government has bound itself by a solemn treaty to respect all just claims which the citizens of California held at its date. I shall not comment upon the good faith with which this obligation has been observed, or whether it was acting in good faith to these new citizens to compel every owner of a grant or title under Mexico to enter into a long and expensive litigation, beginning at home and ending here; a litigation, too, with one who paid no costs, while it was ruinous to the claimant, who, if he retained one-half for himself, when successful, was considered fortunate. Instead of protection of their possessions, they were, in many instances, left a prey to squatters and champertons' attorneys. This was a great evil, but perhaps a necessary one. The change of sovereignty from Mexico to this Government at once gave value to lands which before had none, and which Mexico was glad to give away to colonists for nothing. There unit of measurement was a square league, and eleven of these (nearly equal to 50,000 acres) was the only maximum. The sudden affluence of those of the former settlers who had retained any considerable proportion of their square leagues, and of those who purchased their titles for a trifle, caused not only a mania for land speculation, but a system of extensive frauds, with forged grants and perjured witnesses, such as the world has seldom witnessed. If a large grant of land in California, like the one before us, were suddenly produced from the pocket of some obscure person, such as José de la Rosa or Santillan, it should excite suspicion and be scrutinized with the utmost rigor. But where a grant is public and notorious, without suspicion of fraud or forgery— where a large consideration was paid to the Mexican Govern-

ment—where possession has been taken and held for sixteen years—where numerous purchasers have made improvements worth millions, it is the duty of the court to deal with it according to the rules of equity and justice, instead of applying sharp rules of decision to inflict a forfeiture.

In a country where land had no value, where it was freely given to all who asked, without money and without price, in amounts not to exceed fifty thousand acres, it will be supposed that there are few cases to be found where the Government could raise money by the sale of it. This is, perhaps, the only case to be found where such a sale has been made. The laws of 1824 and 1828 were colonization laws; they regulated grants of land made for this purpose, and restrained the power of the local government as to the amount to be given to one person. They prescribed the proceedings and forms necessary to the validity of such grants. This sale to Vallejo was not a colonization grant, nor were the regulations of 1824 and 1828 applicable to it, nor the decisions of this court in the ratification of grants under them.

That there was a sale by the Governor to Vallejo for a consideration paid, when the Governor could find no other way to raise funds for the support of the Government, is satisfactorily proved. It was a matter of general notoriety at the time. The copy of a letter from the Governor to the grantee accompanying the title is found among the archives. The first title being defective in form, another was given confirming the sale and acknowledging a consideration paid. Possession has followed in pursuance of it. Its authenticity was admitted in the court below. But we are about to forfeit the title on the ground that the Governor, though he might give away land to any amount, had no authority to sell it for money. It is assumed, that because there was a special power given by statute to grant to colonists, therefore he had no other power. This court has frequently decided that the authority of a Governor to make such a grant will be presumed from the fact that he did make it, and that it lay upon those who deny the power to prove the want of it.

But it is assumed that the power did not exist since the reg-

ulations of 1824, because it was not exercised. It is a much better reason for the want of a precedent that land would not be sold where it had so little value that it might be had as a gift to the extent of 50,000 acres.

If this treaty is to be executed in good faith by this Government, why should we forfeit property for which a large price has been paid to the Mexican Government, on the assumption that the Mexican Government would not have confirmed it, but would have repudiated it for want of formal authority? Vallejo was an officer of the army, high in the confidence of the Government. His salary as an officer had been in arrear. In a time of difficulty he furnishes provisions and money to the Government of the Territory. How do we know that Mexico would have repudiated a sale of 80,000 acres as a robbery of its territory, when any two decent colonists, having a few horses and cows, could have 100,000 for nothing?

I believe the Mexican Government would have acted honestly and honorably with their valued servant, and that the same obligation rests on us by force of the treaty.

Now that the land under our Government has become of value these grants may appear enormous; but the court has a duty to perform under the treaty, which gives us no authority to forfeit a *bona fide* grant because it may not suit our notions of prudence or propriety.

We are not, for that reason, to be astute in searching for reasons to confiscate a man's property because he has too much. Believing, therefore, that in the case before us the claimant has presented a genuine grant for a consideration paid, which the Mexican Government would never have disturbed for any of the reasons now offered for confiscating it, I must express, most respectfully, my dissent from the opinion of the majority of the court, with the hope that Congress will not suffer the very numerous purchasers to forfeit the millions expended on the faith of treaty obligations.

Mr. Justice WAYNE. I have examined this case with much attention, and concur in the conclusions of my brother, Mr. Justice *Grier;* and will add, that as I have neither seen

*United States* vs. *Vallejo.*

nor heard anything in the case so conclusive as the judicial opinion of our brother, Judge *McAllister*, I have determined that the best course which I can take to counteract the conclusion to which this court has come in this case, will be to adopt his opinion on the law of the case as more expressive of my dissent than anything I could add. The part of it which I refer to is as follows:

" This case is to be considered as one in which the title-papers are admitted to be genuine, the payment of a money consideration paid, and the possession of the claimant, as was ordinarily taken under the laws and usages of Mexico, established. The sole grounds taken by the Government, on which the validity of this claim is resisted, are:

"1. That no witness proves that a house was built within one year from date of the grant of 1843. That a house was built upon the land prior to the date of either grant by the claimant is clearly proved. That a second house was not built, (as subsequent condition,) especially in the case of an absolute sale, could not authorize a court of equity to forfeit any interest which has become vested in the claimant.

" 2. The second ground is, that the grant of 1844 is invalid, because it is without restriction, and for a consideration of $5,000 in money.

" 3. Because the Governor has exceeded his power in making a grant for the excess of eleven leagues.

"The two last objections, which urge the grant to be void because it was a sale for a money consideration, and because it exceeds in quantity eleven leagues, will be considered together. These objections apply to the second grant of 1844, which purports to be on its very face an absolute sale.

" This grant cannot be deemed, in the language of the Supreme Court of the United States in the *Cambuston* case, (20 How., 64,) 'a pure donation without pecuniary consideration or meritorious services rendered to the Government.' Nor does it purport to be issued under the Mexican colonization law of 1824, or the regulations of 1828. It is treated by the Government at rner for what it really is, an unrestricted sale for a pecuniary consideration. H it oeen a pure donation,

made professedly under the laws of Mexico, professing to have been issued by virtue of those laws, and in pursuance of the terms and provisions prescribed by them, proof of a compliance with the restrictions by the Governor would not have been afforded by the recitals in the grant of his having done so, especially if there had been doubt of the *bona fides* of the grant. This is the extent to which the court went in the *Cambuston* case.

"It does not apply to a *bona fides;* all made to supply the necessary wants of the Government, and applied to the removal of them. If so intended, its practical effect would be in the present and all analogous cases to nullify the applications of the 'principles of equity,' which are made one of the rules of decision by the act of Congress for this court in the exercise of the jurisdiction conferred on it. Nothing was said by the Supreme Court to justify such conclusion. In that case they use language which indicates that if the grant had not been a mere donation, had been free from suspicion, for meritorious services rendered to the Government, or a pecuniary consideration, the claimant would have stood on a different footing. They say, (20 How., 64,) 'In the examination of this case, we have found it very difficult to resist a suspicion as to the *bona fides* of the grant. It is a pure donation, without pecuniary consideration or meritorious services rendered to the Mexican Government.'

"In the case of *Fremont* vs. *United States*, Taney, C. J., says: 'And the grant was not merely to carry out the colonization policy of the Government, but in consideration of the public and patriotic services of the grantee. This inducement is carefully set out in the title-papers; and although this cannot be regarded as a money consideration, making the transaction a purchase from the Government, yet it is the acknowledgment of a just and equitable claim, and when the grant was made on that consideration the title in a court of equity ought to be as firm and valid as if it had been purchased with money on the same conditions.'

"Now, in this case the grant was made for a money consideration by the Governor, to obtain, and who did obtain by it,

the means to maintain the starving soldiers of the country at a critical moment of its then condition. This fact is ascertained by the official communication of the Governor to the grantee, found in the Mexican archives for the year 1843, and referred to in another record for the same year. The grantee was in possession, open and notorious, for three years, undisturbed, prior to the occupation of this country by the Americans. Under such circumstances, could the Mexican Government, had it continued, have refused to have recognised the claim of the grantee with justice or equity?

"If the facts, that the Government received a pecuniary, and, for aught that appears, adequate consideration, must necessarily avoid the grants, with the other circumstance, that the quantity of land granted exceeded eleven square leagues, it must be done because these grants are within the operation of the colonization law of Mexico of 1824, in relation to the distribution of lands by donation, to carry out the colonization policy exclusively, and which restricts the quantity of lands to any one individual to eleven leagues.

"The power to give under certain restrictions, made evidently to prevent fraud in the distribution, did not, by implication, repeal the power, if it previously existed, to sell for a pecuniary consideration, if *bona fide* exercised.

"That such power did exist in the Governors, the court will now consider, and give its reasons for the conclusion to which it is arrived.

"In a work published in 1829, in the city of Mexico, among the laws supposed to be retained in Mexico is the decree of the Spanish Cortes of January 4th, 1813. This law evinced a spirit and policy evidently more liberal than had previously animated Spanish legislation, and which probably did not operate in Spain, or any of its then colonies, but, it is reasonable to believe, that in common with other decrees of the Spanish Cortes was called into active existence by the Spanish revolution of 1819, and was in force at the time of the independence of Mexico.

"Such is the view enunciated by the board of Land Commissioners in the case of the *City of San Francisco* vs. *United*

*States*, and the publication of the decree in Mexico, in 1829, as one of the retained laws, as of force, confirms the opinion of the board.

"The Supreme Court of this State, in the case of *Cohas* vs. *Raisin*, (3 Cal., 443,) distinctly affirm its existence, and cite the compilation in which it is given as 'Leyes Vigentes,' p. 58.

"That tribunal, in the case of *Welch* vs. *Sullivan*, (8 Cal., 168,) again affirm the existence of this decree. The say the decree of the Cortes in 1813 directs, etc.

"But there is internal evidence afforded by the Mexican legislation on the subject of colonization, that the existence of the decree of 1813 was known, and legislation was enacted in view of some of its provisions. The *diseno* making the boundaries of the land petitioned for, which is required to accompany the application to the Governor, is in conformity to the decree of 1813. Again, the conditions usually inserted in the colonization grants under the Mexican law and regulations are similar to those prescribed in the 2d section of that decree. This, in its preamble, among other things, declares its object to be 'to furnish with this class of lands (public lands) in aid of the public necessities (wants) to reward meritorious defenders of their country, and citizens who have no property.' The evident intent of this decree, declared on its face, is, that common or public lands should be converted into private property, and lands granted should be distributed in full property, and with established metes and bounds. Upon a careful revision of this decree the conclusion must be, that in the absence of other legislation the carrying out this decree must have devolved on the executive department, and the Governors of California, under the instructions of the Supreme Government, would have the power to grant common lands. Now by that decree the quantity of land granted to one individual was not limited to any given quantity; but as to persons, it was limited to citizens.

"The only instance in which quantity is limited is in certain donations to certain official persons, to whom small lots of prescribed extent were to be granted. This decree authorized grants to meritorious defenders, and a sale of land to aid the public necessities; and such sale, made in good faith, would

be the legitimate exercise of power, unless the provisions of the decree confirming the power have been repealed by subsequent legislation. Have they been repealed, expressed or by fair implication, by the colonization law of 1824 of Mexico, or by the regulations of 1828?

"Animated by a more liberal view of her interests, Mexico determined to afford inducements to emigration, and she opened her public lands to foreigners as well as citizens, and determined to make donations for colonization purposes to all who strictly complied with the terms which, in the distribution of the land, she prescribed to prevent fraud. Among these was limiting the quantity of land in any donation to a single person to eleven leagues. There are many reasons for the legislation of Mexico to surround her system of colonization with checks and limits when the Governors were to distribute the public lands, which do not apply to a *bona fide* sale for money consideration. Such is not a case which, by implication, should be brought within the colonization laws. The construction of a law, from the action of those whose duty it is to carry it out, should be considered when endeavoring to ascertain the intention of the Legislature. The fact that sales have been made by Governors of lands in quantities of more than eleven leagues, who would grant by donation to a colonist not more than eleven, is a circumstance not to be disregarded.

"By the records of the case, *United States* vs. *Rodriguez*, No. 479, among the files of the papers of the board of Land Commissioners, it is made to appear that Governor Pio Pico issued a grant for twelve leagues in consideration of the sum of $12,000, past indebtedness to the Government. The board of Land Commissioners confirmed the claim. The land in that case is situated in the southern district, and the records inaccessible to us, and it is impracticable to ascertain whether any appeal is pending, has been made, or been dismissed. The opinion of the board is, however, on file among the archives in the Surveyor General's office. In that opinion it is stated, 'that in consequence of the importance of the two questions

involved, the court took the case under advisement, and also for the reason that the determination of the case would settle the fate of a large number of cases undetermined, so far as the action of that tribunal was concerned.' The first of those questions involved the only two grounds taken in the present. It was, whether the power of the Government of California, under the Mexican authority, existed to sell or grant for a consideration of money, or with limits to exceed in amount eleven leagues. The board decided that he had such power.

"In the case of *The United States* vs. *M. G. Vallejo*, No. 321, the same tribunal affirmed the principle decided in the previous case, and confirmed the claim to fifteen leagues. In their opinion the board say, 'there appears no objection to the confirmation of this claim, except that it exceeds in amount the maximum authorized to be granted under the provision of the colonization law. The last five leagues do not appear to have been granted under those provisions, but a sale for an actual consideration received by the Government of two thousand dollars. This point was fully considered and decided by the court in case 479, and the doctrine recognised that a *bonâ fide* sale, made for a full consideration, by the Governor of California, under the Mexican laws, vested in the purchaser both a legal and equitable interest, of which he would not be divested by the Government by any rules of law or equity.' No power, certainly, was given by the colonization law of 1824, authorizing the Governor to grant by way of sale, under any circumstances. If, therefore, he does not possess the power independently of that law, it exists nowhere, and a money consideration need-not to have been referred to the U. S. Supreme Court to illustrate the equities of parties applying for a confirmation of their grants.

"In the *Cambuston* case, (20 How., 4,) they assign as a reason for a strict interpretation of the claimant's grant, and its want of equity, that there had been no pecuniary consideration paid. In *Fremont's* case, (17 How., 558,) they refer to the fact that the grant was given for meritorious and patriotic services, and should place the claimant on a footing with one who had pur-

*United States* vs. *Vallejo.*

chased with money, and thus give a just and equitable claim against the Government, the title to which in a court of equity would be firm and valid.

"No sale, it would seem, for any amount of money, could be legal so as to pass a title, if it be conceded that no power on the part of the Governor to make a grant of the kind existed. It does appear to me, that when the Supreme Court refers to the money consideration of a grant as vesting in the holder of it a superior equity, by so doing they have at least not decided that the Governor's act was void.

"They must have acted under the impression that the power to sell in good faith was in the Governor, or that the equity of the case was such as gave 'a just and equitable claim against the Government,' the title to which in a court of equity would be 'firm and valid.' In either view, but especially on the ground of a power in the Governors of California, apart from the colonization law, to aid in good faith, by a sale of land, the public necessities, this court considers that a decree affirming that of the board of Land Commissioners in this case must be entered."

The Chief Justice, Mr. Justice *Catron*, Mr. Justice *Clifford*, and Mr. Justice *Swayne*, concurred in the opinion of Mr. Justice *Nelson*.

*Decree of the District Court reversed and record remitted, with a mandate ordering that the claimant's petition be dismissed.*