THE CAPITAL OF PUERTO RICO, Plaintiff and Appellant, *v.* CASINO ESPAÑOL, Defendant and Appellee.

No. 7731. Argued April 2, 1940.—Decided May 22, 1940.

*J. Valldejuli Rodríguez* for appellant. *R. Cuevas Zequeira* for appellee.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the court.

This is an action for the recovery of personal property. An oil portrait of Isabel II, Queen of Spain, by Federico Madrazo is sought to be recovered. Judgment was entered against the plaintiff, which has appealed and assigned two errors in its brief, to wit: (1) that the trial court erroneously weighed the evidence, and, (2) that it held that the action has prescribed.

The issue was raised by the Capital of Puerto Rico, as plaintiff, as follows:

The Capital of Puerto Rico is the successor of the Municipality of San Juan and as such the owner of the painting claimed. The latter is unlawfully in the possession of defendant. It is worth $30,000.

The Casino Español, defendant herein, denied that the plaintiff owned the painting and alleged, on the contrary, that it owns the same, having acquired it by donation made to it by Manuel Fernández Juncos in 1913.

As new matter defendant alleged that the action prosecuted by plaintiff had prescribed, pursuant to sections 1863, 1856 and 616 of the Civil Code (Comp. 1911), corresponding to sections 1862, 1855 and 549 of the same statute, 1930 ed.

760

The case went to trial and the court rendered judgment on September 12, 1936, as already stated, against defendant, on the ground that the painting was in the lawful possession of defendant by virtue of the same having been donated to it by Manuel Fernández Juncos and the time elapsed. It was held that the action of plaintiff had prescribed.

■ Let us consider the evidence. The first witness introduced by plaintiff was Roberto H. Todd. Briefly, he testified that he had been Mayor of San Juan for many years and on several occasions, and prior to 1901 he had been municipal councillor. He did not see the said painting in the city hall. He was shown a book entitled "Inventory signed on September 25, 1873" with the following entry on p. 6: "An oil painting, full size, of Doña Isabel II, with gilt frame," and stated that he supposed it belonged to the Municipality of San Juan. The book was introduced in evidence and admitted without objection.

He saw the painting in the home of Manuel Fernández Juncos, a well reputed Spaniard, highly respected by Puerto Ricans and Spaniards, who was Secretary of the Treasury during the Autonomic Administration. The painting hung in the hall with other paintings. He saw it again in the main hall of the Casino Español when the latter was in Fortaleza street. He noticed on it the following inscription: "Municipality of Puerto Rico and then the author's name, Madrazo. The witness was at the time Mayor of San Juan and did not take any steps to claim the painting. Nothing to the contrary was stated by him to an inspector from the Auditor's office. He communicated with Pérez Losada, the secretary of the Casino, who told him that the latter had acquired the painting by donation or purchase, he did not remember well, from Manuel Fernández Juncos. He made no further inquiries.

An affidavit of José Mauleón was then read, in which he stated that he began to work for the Municipality of San Juan of Puerto Rico, now the Capital of Puerto Rico, during

the incumbency as Military Mayor of Francisco del Valle Atiles and then saw in the session hall of the municipality the painting in question. That the pictures remained there until the change of sovereignty in 1899 but he does not know why they were not kept in the town hall as the property of the people.

Arsenio R. Rodríguez, an inspector from the office of the Auditor of Puerto Rico, took the stand and stated that he made as such inspector an investigation of the books of the Capital of Puerto Rico in connection, among other things, with the portrait of Queen Isabel II painted by Madrazo, and spoke with Mr. Todd as well as with Mariano Abril, Adolfo de Hostos and Mario Brau in regard to the matter; that he examined the inventory which includes as far as the year 1873, and filed his report.

Luis A. Castro, Secretary of the Capital, testified that the municipal archives date back to 1631 and after making an examination thereof he failed to find any document recording the sale by the municipality of the painting of Doña Isabel II. It is recorded that the picture was bought by public contributions from the residents of San Juan who donated the same to the municipality.

Such was the evidence introduced by the plaintiff. The defendant called to the stand Juan García Verdomar, 75 years old, born in Coruña, Spain. He came to this Island on December 3, 1885. He became an employee of the municipality from the middle of July, 1890, first as city policeman and then as orderly to the mayor. He kept his job until the incumbency of Mr. Todd as mayor when he retired. He saw in the session hall the portrait of the Queen. He remembers having seen in 1898, when the change of sovereignty took place, don Manuel Fernández Juncos in the municipality with other gentlemen walking about the corridors adjoining the session hall and talking "about the property belonging to Spain," and he noticed that one of the gentlemen asked don

Manuel ''What do you want that for?'' to which he answered, ''Well, to make a museum.''

José Pérez Losada, secretary of the Casino Español ever since 1909, testified that there were in the Casino two portraits of Queen Isabel II, painted by Madrazo, one of them of a very large size, life size, which was acquired by donation made by don Manuel Fernández Juncos, an exalted member of the Spanish colony, recognized as a good friend not only of the Spaniards but of the Puerto Ricans as well.

A book was shown to the witness who recognized it as the minutes book of the Casino from December 6, 1907, to March 1916. The defendant introduced as evidence the last paragraph of the minutes recorded on p. 249 concerning the picture of Queen Isabel II. The same was admitted over the plaintiff's objection.

The witness went on stating that ever since 1913, when the picture was donated to the Casino, it was hung in the hall next to the ballroom. When the Casino was moved to San José Street and then to Fortaleza Street, it was hung in the ballroom. At present it is hung in the reading room of the Casa de España. The portrait was retouched and varnished and placed in a new frame. The Casino has never been disturbed in the possession thereof. The inscription on the portrait reads: ''Ayuntamiento de Puerto Rico, 1866.'' (Municipality of Puerto Rico, 1866.)

He remembers having seen the portrait in the home of don Manuel Fernández Juncos about 1899 or 1900 and he personally knows that don Manuel donated it to the Casino. The latter has no building of its own. It is housed in the Casa de España, another Spanish institution. The only instrument evidencing the donation is the minutes. The portrait might be worth $5,000.

Ramón Fernández Náter, a son of don Manuel, took the stand. He stated that the portrait in controversy was taken to his home October, 1898. Formerly it was kept in the municipality abandoned in a downstairs room together with

old furniture. It was taken to his home together with other articles from the municipality. "My father saw that picture there and he was very sorry and spoke to Mayor Francisco del Valle Atiles and don Francisco told him that he had no objection in donating the picture to him; but that he had his doubts, that there was a military governor, General Ortega, that without him . . . . . The General called at home . . . . . told my father that he had no objection to those pictures coming into his possession, becoming his."

He stated that the portrait was always hung in a visible place in the several houses where his father lived. "On my mother's death, my father was left alone with my sisters and they took a smaller house and father made a present of that portrait of Isabel II to the Casino Español." The picture was never claimed by the municipality while in his father's possession.

Angel Cruz, archivist of the Capital, since July, 1934, who had been summoned and requested to bring the inventories subsequent to 1898, testified that owing to the short notice given him he had been unable to find them, the search being hard because they were not properly filed.

On a book being produced he answered: "From my own knowledge and from what I am able to read here, it is a minutes book which reads 'Municipality of San Juan, 1899.'" He is asked to tell whether or not "there is recorded in the book a resolution concerning a picture of Isabel II of Spain. His answer was that for that he would need to read the whole book. The incident is repeated in connection with others, but the witness is unable to furnish any concrete information regarding the matter.

When the defendant rested, the plaintiff called again to the stand Arsenio R. Rodríguez, inspector from the office of the Auditor of Puerto Rico. He stated that the Auditor's office is in charge of the property and accounts of the Municipalities of Puerto Rico. He is shown the minutes books of the Municipality of San Juan for 1898, 1900 and 1901, and

he said that he had examined them at the time of his investigation, as well as others—1895 to 1935—"page by page trying to find out whether there was any resolution donating, conveying, selling or ceding in any way those pictures, that of Queen Isabel II painted by Madrazo, and that of Ramón de Castro painted by Campeche, to the Casino Español or to Mr. Marxuach. The investigation which was ordered by the Auditor on a complaint took him a full month. He filed his report, a copy of which is introduced in evidence. The defendant objects and the court rules "let it remain as evidence offered and not admitted."

His testimony closes as follows:

"Q.—Did the Municipality of San Juan or the Capital of Puerto Rico ever complain that these pictures were missing?

"A.—They did not.

"Q.—So that this took place upon the complaint of a private individual, on a charge?

"A.—That is so."

Then comes the testimony of Mario Brau Zuzuárregui, director of the Museo Insular. At the time of the trial he was 66 years of age. He knew the Municipality of Puerto Rico ever since he was 10 years old—la Casa Consistorial (City Hall)—where there were several portraits, among which was that of Isabel II. He asserts that the picture of Isabel II was there until a little over three years after the arrival of the Americans. It is the same picture which he saw afterwards in the Casino Español properly retouched and varnished. He appraises the same at $2,000.

After many questions he ultimately admitted to have originated this controversy, having in view an investigation as to what had become of the portrait of General Castro rather than that of Isabel II.

The transcript fails to include the minutes book of the Casino Español offered in evidence by defendant and admitted by the court over the objection of the plaintiff. This par-

ticular is referred to by the trial judge in his opinion, as follows:

"Mr. Fernández Juncos continued in possession of the picture until 1913, when he donated the same to the Casino Español, as appears from a resolution recorded in the minutes of the session held on December 23, 1913, transcribed on folios 248 and 249 of the minutes book of said social center. The aforesaid resolution reads as follows:

" 'It is likewise resolved to accept the gift from don Manuel Fernández Juncos to the Casino of the highly valuable oil painting of the former Queen of Spain doña Isabel II by the famous painter Madrazo and that Mr. Fernández Juncos be most effusively thanked'."

After a consideration of the evidence in connection with the judgment of the court, it must be concluded that the error assigned, viz., that referring to the weight of the evidence, is without merit.

Apart from certain unnecessary statements, more or less justified, contained in its opinion, the trial court found that ever since 1866 the Municipality of San Juan was in possession of and owned, as recorded in an inventory, a picture of the Queen of Spain Isabel II which decorated the assembly hall of the city hall; that when the change of sovereignty occurred (1898) Francisco del Valle Atiles, Mayor of San Juan, delivered, with the consent of the last Spanish Military Governor of the Island, General Ortega, to don Manuel Fernández Juncos the above picture which he held thereafter and then donated in 1913 to the Casino Español which accepted the gift and hung it in a conspicuous place in the several buildings where the Casino has been housed, and which has been in possession thereof in turn without being claimed by anybody until January 20, 1936, when the present action was instituted. Such findings are amply supported by the evidence.

Now, could the Mayor by himself or with the consent of the Governor dispose of the picture in the way he did? Did Manuel Fernández Juncos acquire a valid ownership title to the portrait by virtue of the delivery?

These questions must necessarily be answered negatively. No other answer is possible. The actions of the Mayor and of the Governor were without authority under the law. They were without power to dispose of the property of the Municipality in the way they did. Mr. Fernández Juncos did not acquire by the delivery any ownership right to the portrait. Sections 89 *et seq.* and 118 *et seq.* of the Municipal Law of 1896; *People* v. *Municipality of San Juan*, 19 P.R.R. 625.

But the delivery was a fact and facts were also the possession of the portrait by don Manuel Fernández Juncos publicly, as owner and uninterruptedly until 1913, the donation made by him at that time to the defendant, the latter's acceptance and possession thereof publicly, peacefully, as owner, until 1936, and these facts are invoked by the defendant as a defense to the action prosecuted against it.

Do the above facts entitle the Casino Español, defendant herein, to continue in possession of the portrait in question, notwithstanding the original title in the municipality and the delivery thereof to the possessor from which defendant derives its title, as was decided by the district court? Let us see.

Section 1862 of the Civil Code, 1930 ed., invoked by defendant provides:

"Section 1862.—Real actions with regard to personal property prescribe after the lapse of six years from the loss of possession, unless the possessor may have during a shorter term acquired the ownership in accordance with section 1855, and with the exception of the cases of loss and public sale, and those of theft and robbery, in which cases the provisions of the third paragraph of said section shall be observed."

Section 1855 referred to provides:

"Section 1855.—The ownership of personal property prescribes by uninterrupted possession in good faith for a period of three years.

"The ownership of personal property also prescribes by uninterrupted possession for six years, without the necessity of any other condition.

"The provisions of section 393, Chapter III, Title V, Book Second, of this Code, shall be observed with regard to the rights of the owner to recover the personal property lost or of which he may have been illegally deprived, and also with regard to those acquired at an auction, on exchanges, at fairs or markets, or from a merchant legally established or customarily engaged in the traffic of similar objects."

And section 393 reads:

"Section 393.—The possession of personal property acquired in good faith, is equivalent to a title thereto. Nevertheless, any person who has lost any movable or has been illegally deprived thereof, may recover it from the person in possession of the same.

"If the possessor of a movable lost or stolen has acquired the same in good faith at a public sale, the owner cannot obtain the restitution thereof without reimbursing the price paid therefor.

"With regard to things acquired on the exchanges, or at fairs or markets, or from a lawfully established merchant habitually occupied in dealing with objects of the kind, the provisions of the Code of Commerce shall be observed."

Section 549 of the Civil Code, also invoked by defendant, which specifies the different ways of acquiring ownership, includes, among others, prescription and donation.

In his commentaries on section 1962 of the Spanish Civil Code, similar to section 1862 of our Civil Code, *supra*, Manresa expresses himself as follows:

"This rule of prescription is derived from that established for acquisitive prescription of such kind of property. In effect: from our examination of the provisions of section 1955, we saw that the ordinary prescription of ownership of movables ensued from the uninterrupted possession and in good faith during three years, and the extraordinary prescription took place after the lapse of six years of possession of the thing the subject of prescription without the need of the concurrence of any further requisite. And if by virtue of either of said prescription the possessor acquires the ownership of such kind of property, it is unquestionable that by the lapse of the term fixed for each of them the right of the owner thereto is to be extinguished and, consequently, any action to which he might be entitled for claiming or recovering the thing the subject of the prescription prescribes, because ownership in two different persons can not subsist, unless in the case of jointly owned property. This

is why section 1962, wherein said rule of prescription is provided, fixes the term of six years for those cases where the possessor has: not acquired the ownership by reason of a shorter time; that is, those cases where ordinary prescription has not previously taken place.

"As to the other exceptions stated, they are merely a reproduction of those enumerated in paragraph 3 of section 1955, *supra*, according to which compliance must be had in such cases with the provisions of section 464, and as, when treating of the term for the acquisitive prescription of movables, we stated everything relating to such particulars, we call attention to what we then said and will not further dwell on this point." Manresa, Commentaries on the Civil Code, p. 795, 4th ed.

What was previously said, in its pertinent part, reads as follows:

"At first, it seems as if there was some conflict between the provisions of section 1940, which require in every case as a prerequisite for the ordinary acquisitive prescription the concurrence of proper title, and those of the paragraphs mentioned of section 1955 under which such requisite is unnecessary for either the ordinary or the extraordinary prescription as to movables. Such conflict, however, vanishes if we bear in mind the provisions of section 464, according to which the possession of such kind of property, acquired in good faith, amounts to a title, and, therefore, the provisions of section 1940 in that part thereof requiring the concurrence of such requisite has reference to those cases where the possession by itself does not. amount to title, as happens in the ordinary acquisitive prescription of real property.

"Save in the case of the prescription of movables possessed in good faith, in all others a proper title is required for ordinary prescription. Where this requisite is lacking, the extraordinary prescription only can take place.

"  .     .     .     .     .     .     .     .

"The extraordinary prescription of movables, authorized by paragraph 2 of section 1955, *supra*, does not require any requisite other than the uninterrupted possession for the time expressed therein, and it has been so held by the Supreme Court, as regards public property, in its judgment of March 31, 1902 (93 J. C. 528), in which, among others, the doctrine was laid down to the effect that 'ownership of movables, including public property, prescribes after the lapse of

six years without any further requisite, and that any judgment which fails to apply the doctrine laid down by paragraph 2 of section 1955 of the Civil Code violates the same.' It is unnecessary to say that such uninterrupted possession during such time, considered by law as the efficacious means for the acquisition of such property by prescription, must be as owner, for, although the law does not say so, it must be so understood in view of the provisions of section 447, which establishes that only the possession acquired and enjoyed by a person as owner can operate as title for the acquisition of ownership, inasmuch as the generality of such rule excludes every distinction regarding this particular between ordinary and extraordinary prescription.'' 12 Manresa, Commentaries on the Spanish Civil Code, pp. 760 and 762, 4th ed.

See also the decisions of this court in *García et al* v. *Sabino et al.,* 19 P.R.R. 265, and *García et al* v. *Suro et al.,* 19 P.R.R. 420, where the question of prescription of movables whether ordinary or extraordinary is discussed.

If we apply the law, the commentaries and the jurisprudence to the facts herein, we shall have necessarily to conclude that the former possessor had already acquired by extraordinary prescription the ownership of the portrait at the time he donated the same to the present possessor, and even if it were otherwise, the present possessor, that is, the Casino, would always have acquired the same, whether the period of three years or that of six years is applied.

Not six but about fourteen years elapsed in the case of the former owner, and neither three nor six but about twenty-three years elapsed in that of the latter. The possession of both together exceeded thirty years which is the term required for the prescription of real property.

It is, therefore, evident that owing to prescription the defendant acquired in any case the right claimed by it in its defense, and the plaintiff lost its right of action.

The plaintiff, however, alleges that it would be so if private individuals were involved, but as the plaintiff is a governmental corporation created for the purpose of facilitating the administration of the state, prescription does not

run as against it, that is to say, it maintains that the maxim, *Nullum tempus occurrit regi,* is applicable herein.

In *People* v. *Dimas,* 18 P.R.R. 1019, 1038, we said:

"In determining the rights of the defendant in this case with reference to the question of prescription we can only take into consideration such facts as have transpired up to 1898 when the Spanish sovereignty of this Island ceased and the American sovereignty commenced. After this date it was not possible to acquire the lands referred to in this suit by prescription. With regard to this point the trial judge expressed himself as follows:

" 'According to the maxim *nullum tempus ocurrit regi,* the invariable rule of the English law, no title to Crown lands could be acquired by adverse possession. This rule has undergone later some changes by statute. The English doctrine prevails in the United States where, as in England, no title by adverse possession can be acquired against the sovereign. By the application of this principle the only manner in which titles to land owned by the Government can be acquired is under an act of the Congress directly making the grant or authorizing it to be made by some officer. In this case, even though the land ceded to the United States could be acquired by prescription under the former laws, nevertheless if the ownership was not complete before the territory was ceded, prescription cannot be alleged against the United States. See Cyc., Vol. 1, pp. 1111 and 1112.

" 'The same principle applies in favor of the States of the Union. In the absence of a provision authorizing the prescription of lands belonging to the States no title by adverse possession can be acquired

" 'Even if the Legislature of the Island had remained silent, the right of ownership of The People over lands belonging to them would not prescribe now under the application of the rule obtaining in the States. The Legislative Assembly, however, has enacted this principle in the Political Code, section 9 of which clearly and categorically states that title to Insular waste lands cannot be acquired by adverse possession.

" 'By the application of this principle, even if the lands ceded to the United States and acquired subsequently by The People of Porto Rico should be subject to prescription under the laws formerly in force, nevertheless, if at the time of the change of sovereignty the right of ownership had not been vested in the possessor, the prescription was thus interrupted and cannot now be asserted against the plaintiff.

" 'Prescription, as Manresa rightly says in his Commentaries on the Spanish Civil Code, is not a right which has been created or acquired, but a mere expectation, a hope, a compliance with, or realization of, which depends upon a multitude of events; and not being an acquired right its realization cannot be deemed subject to the legislation which governed formerly and by the force of which the said right or the legal act from which it originated or to which it owed its existence, would have been perfected.

" 'By virtue of the change of sovereignty consummated when the Treaty of Peace was signed a radical change took place in the political laws of this Island and all the laws of political origin as well as those dependent upon the will of the Crown such as those governing the conveyance and management of public property were entirely revoked *ipso facto.*

" 'It is a doctrine firmly established that when a sovereignty cedes any territory to another the laws of the former authorizing the alienation of any portions of the public domain and the authority of officers charged with that power are completely abolished. *More* v. *Steinbach,* 127 U. S. 70, 81; *Ely's Administrator* v. *United States,* 171 U. S. 220, 230; *United States* v. *Vallejo,* 1 Black 541; *Harcourt* v. *Gaillard,* 12 Wheat. 523.

" 'In accordance with this doctrine the lands ceded by Spain to the United States should be governed and regulated by the laws of this Island and not by the laws of the nation which ceded them.' (Opinion of the trial judge, Hon. Córdova Dávila, pp. 36, 37 and 38 of the transcript.) "

The above, however, was expressed with reference to The People of Puerto Rico, a sovereign entity, and not with reference to municipalities. In regard to the latter the rule to be applied was laid down in *Logan County* v. *City of Lincoln,* 81 Ill. 156, 158, as follows:

" . . . . Our understanding of the law is, that, as respects all public rights, or as respects property held for public use, upon trusts, municipal corporations are not within the operation of the Statute of Limitations, but in regard to contracts or mere private rights, the rule is different, and such corporations, like private citizens, may plead or have pleaded against them the Statute of Limitations."

This rule was laid down more at length and on a wider and more convincing reasoning by the Supreme Court of the

United States in *Metropolitan R'D* v. *Dist. of Columbia*, 132 U.S. 1. Speaking for the court, Justice Bradley expressed himself partly as follows:

"It is contended by the plaintiff that it (the District of Columbia) is not amenable to the statute of limitations, for three reasons: first, because of its dignity as partaking of the sovereign power of government; secondly, because it is not embraced in the terms of the statute of limitations in force in the District; and, thirdly, because if the general words of the statute are sufficiently broad to include the District, still, municipal corporations, unless specially mentioned, are not subject to the statute.

"1. The first question, therefore, will be, whether the District of Columbia is, or is not, a municipal body merely, or whether it has such a sovereign character, or is so identified with or representative of the sovereignty of the United States as to be entitled to the prerogatives and exemptions of sovereignty."

He then surveys the government of the District and the changes it has undergone since its first organization, and proceeds:

"We are clearly of opinion that the plaintiff is a municipal corporation, having a right to sue and be sued, and subject to the ordinary rule that govern the law of procedure between private persons.

"2. But the Supreme Court of the District supposes that municipal corporations are not embraced in the words of the statute of limitations. Let us see whether that view can be maintained.

"The statute in force in the District is that of Maryland, passed in 1715, c. 23. The act, as regards personal actions, is substantially the same as that of 21 James I. It commences with a preamble, as follows: 'Forasmuch as nothing can be more essential to the peace and tranquility of this province than the quieting the estates of the inhabitants thereof, and for the effecting of which no better measures can be taken than a limitation of time for the commencing of such actions as in the several and respective courts within this province are brought, from the time of the cause of such actions accruing.' It is then enacted, 'that all actions of......shall be commenced or sued within....' Corporations are 'persons' in the law. There is no apparent reason why they should not be included in the statute. It is conceded that private corporations are included. On what

ground, then, can municipal corporations be excluded? Not on the ground that they are not 'persons,' for that would exclude private corporations. They are, therefore, within the terms of the law.

"3. Are they not also within the spirit and reason of the law? They are certainly within the reason of the preamble. It is just as much for the public interest and tranquility that municipal corporations should be limited in the time to bring suits as that individuals or private corporations should be. The reason stated in the preamble for the passage of the law applies to all; and, moreover, it shows that the objects of the law are beneficent ones, and, therefore, that it should be liberally construed. It cannot apply to the sovereign power, of course. No restrictive laws apply to the sovereign, unless so expressed. And especially no laws affecting a right on the ground of neglect or laches, because neglect and laches cannot be imputed to him. And it matters not whether the sovereign be an individual monarch, or a republic or state. The principle applies to all sovereigns. The reason usually assigned for this prerogative is, that the sovereign is not answerable for the dilinquencies of his agents. But whatever the true reason may be, such is the general law, except where it is expressly waived. The privilege, however, is a prerogative one, and cannot be challenged by any person inferior to the sovereign, whether that person be natural or corporate.

"It is scarcely necessary to discuss further the question of the applicability of the statute of limitations to a purely municipal corporation when it is embraced within the general terms of the law. It was expressly decided to be applicable in the cases of *Kennebunkport* v. *Smith*, 22 Maine, 445; *Cincinnati* v. *First Presbyterian Church*, 8 Ohio, 298; *Cincinnati* v. *Evans*, 5 Ohio St. 594; *St Charles County* v. *Powell*, 22 Missouri, 525; *Armstrong* v. *Dalton*, 4 Devereux, (Law,) 568; and other cases cited in the notes to Wood on Limitations, sec. 53; and to 2 Dillon on Municipal Corporations, sec. 668, 3d ed. Judge Dillon, in the section last cited, accurately says: 'The doctrine is well understood, that to the sovereign power the maxim, *"nullum tempus occurrit regi,"* applies, and that the United States and the several States are not, without express words, bound by statutes of limitation. Although municipal corporations are considered as public agencies, exercising, in behalf of the State, public duties, there are many cases which hold that such corporations are not exempt from the operation of limitation statutes, but that such statutes, at least as respects all real and personal actions, run in favor of and against these corporations in the same manner and to the same extent as against natural persons.'...

"What may be the rule in regard to purprestures and public nuisances, by encroachments upon the highways and other public places, it is not necessary to determine. They are generally offenses against the sovereign power itself, and, as such, no length of time can protect them. Where the right of property in such places is vested in the municipality, an assertion of that right may or may not be subject to the law of limitations. We express no opinion on that point, since it may be affected by considerations which are not involved in the present case."

Applying the rule in its widest sense, that is, taking into account the distinction recognized by the Supreme Court of Illinois and by Dillon and hinted at in the last paragraph of the opinion of the Federal Supreme Court just transcribed, even so the present case could not be included among those not covered by the statute of limitations, because no property for public use is involved.

We may adopt as a rule to be followed that established by sections 255, 256 and 257 of the Civil Code, 1930 ed. According to them the following are things of public domain: those intended for public use, such as roads, canals, rivers, streams, and others of a like nature. The property of public use in Puerto Rico and the towns thereof comprises the insular and local roads, the squares, streets, fountains and public waters, walks, and public works for general use, paid for by the said towns or from the Treasury of Puerto Rico.

All other property possessed by municipalities is common property (patrimoniales), that is, property privately owned, and shall be governed by the provisions of the Civil Code, which include those relating to limitation.

The property herein involved,—although the same might be actually considered as a work of art acquired and preserved by the municipality for the benefit of the public,—is not included among those specified by law of public domain or use, nor is the same similar thereto. At least, neither has the appellant cited nor have we been able to find among the Spanish or American precedents examined by us, any decision that might lead us to a contrary decision.

Having decided this point, we must, of course, also hold that the second and last of the errors assigned and which has to do with the application to the instant case of the statute of limitation is also without merit and, therefore, that the appeal must be dismissed and the judgment appealed from affirmed.

Mr. Justice Wolf concurs in the judgment and in the first part of the opinion. As to the second part he also concurs but on somewhat different grounds.